*Richmond D. Phillips v. State of Maryland*, No. 7, September Term, 2016. Opinion by Getty, J.

**MOOTNESS — EFFECT OF PROSPECTIVE AMENDMENTS TO STATUTE —** A court's interpretation of a statute is not rendered moot due to amendments to the statute that took effect while case was on appeal and apply only prospectively. There is still an existing controversy between the parties when the court must determine whether the State satisfied the requirements of the statute as it existed at the time of trial, and the court can still fashion an effective remedy by deciding on the proper interpretation of the previous version of the statute.

**CRIMINAL LAW — DNA ADMISSIBILITY STATUTE (COURTS & JUDICIAL PROCEEDINGS § 10-915) — COMPLIANCE WITH DNA TESTING STANDARDS —** The previous version of the DNA Admissibility Statute provided that DNA evidence is automatically admissible if the analysis was performed in accordance with "standards established by TWGDAM or the DNA Advisory Board." The Federal Bureau of Investigation's Quality Assurance Standards ("QAS") are standards established by the DNA Advisory Board. Thus, the Laboratory's DNA analysis, performed in accordance with the QAS, satisfied the DNA Admissibility Statute's requirements and was automatically admissible at trial.

Circuit Court for Prince George's County
Case No. CT 11-1027X
Argued: October 6, 2016

IN THE COURT OF APPEALS
OF MARYLAND

No. 7

September Term, 2016

_____

Richmond D. Phillips

v.

State of Maryland

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Getty
Battaglia, Lynne A.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Getty, J.

_____

Filed: January 20, 2017

This appeal requires us to determine whether a deoxyribonucleic acid ("DNA") analysis conducted in accordance with the Federal Bureau of Investigation's ("FBI") Quality Assurance Standards ("QAS") qualifies for automatic admissibility under § 10-915 of the Courts and Judicial Proceedings Article ("CJP") of the Maryland Code. Petitioner Richmond Phillips argues that the DNA evidence is not admissible because the analysis was not performed in accordance with standards established by one of the two entities named in CJP § 10-915 ("DNA Admissibility Statute"), and because the methods of analysis that were used are not generally accepted as reliable in the relevant scientific community under *Frye-Reed*.[1] The trial court and the Court of Special Appeals agreed with Mr. Phillips that the DNA evidence did not qualify for automatic admissibility under § 10-915, but held that the evidence was nonetheless admissible under *Frye-Reed*. Mr. Phillips now challenges the latter conclusion, while the State challenges the former.

For the reasons that follow, we hold that the DNA evidence was automatically admissible under CJP § 10-915. Accordingly, the trial court should not have conducted a *Frye-Reed* hearing to determine its admissibility, and we will not address Mr. Phillips' contention that the trial court's ruling at that hearing was erroneous.

**BACKGROUND**

---

[1] *Frye-Reed* refers to Maryland's standard for determining the admissibility of scientific evidence. "[B]efore a scientific opinion will be received as evidence at trial, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field." *Reed v. State*, 283 Md. 374, 381 (1978) (citing *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)). A *Frye-Reed* hearing is the pretrial hearing at which the proponent of the scientific evidence must establish such general acceptance if the admissibility of the evidence is challenged.

The State charged Mr. Phillips with the first-degree murders of his ex-girlfriend, Wynetta Wright, and their eleven-month-old daughter, Jaylin Wright, which took place on May 31, 2011. Wynetta died of a gunshot wound to the head. Her body was found in a park near the Hillcrest Heights Community Center in Prince George's County. Jaylin died of hyperthermia as a result of being left in a hot vehicle for an extended period of time. Her body was found in Wynetta's car in a parking lot near the park. Mr. Phillips admitted to meeting with Wynetta in the park in the early morning hours of May 31, but denied any involvement in her death or Jaylin's death.

The police obtained DNA samples from the crime scenes, the victims, and Mr. Phillips, which were tested in June 2011 by forensic chemist Jessica Charak of the Prince George's County Police Department Crime Laboratory ("Prince George's County Laboratory" or "Laboratory"). Two samples are relevant to this appeal: a buccal swab[2] from Mr. Phillips, and a sample obtained from the steering wheel of Wynetta's car. Based on Ms. Charak's analysis, she concluded that the steering wheel sample was consistent with Mr. Phillips' DNA profile and, therefore, he could not be excluded as a contributor to the sample. Ms. Charak found that the steering wheel sample also contained genetic material from Wynetta, Jaylin, and at least two additional unknown contributors. Ms. Charak calculated that "[t]he chances of selecting an unrelated individual from the random population who would be included as a possible contributor to the mixed DNA profile

---

[2] A buccal swab "is obtained by swabbing the cheek area inside a person's mouth." *Derr v. State*, 434 Md. 88, 99 n.6 (2013) (quoting *Young v. United States*, 63 A.3d 1033, 1036 n.3 (D.C. 2013)).

obtained from the evidence sample . . . are approximately . . . 1 in 2.93 million individuals in the African American population."

Prior to trial, Mr. Phillips filed a motion *in limine* to exclude the State's DNA evidence and related expert testimony. Mr. Phillips argued that the Prince George's County Laboratory's methods of analyzing complex, low-template DNA[3] samples were not generally accepted as reliable in the relevant scientific community, and thus the evidence was inadmissible under *Frye-Reed*. The State responded that the DNA evidence and related expert testimony were automatically admissible under CJP § 10-915, and thus a *Frye-Reed* hearing was not necessary to determine admissibility.

The DNA Admissibility Statute in effect throughout Mr. Phillips' proceedings provided that DNA evidence "is admissible to prove or disprove the identity of any person," so long as certain conditions are fulfilled:

(a) *Definitions.* —

> (1) In this section the following words have the meanings indicated.
>
> (2) "Deoxyribonucleic acid (DNA)" means the molecules in all cellular forms that contain genetic information in a chemical structure of each individual.

---

[3] A "complex" DNA sample is defined as a mixture "with more than two contributors." President's Council of Advisors on Science and Technology, *Report to the President: Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* 75 (Sept. 2016), https://www.whitehouse.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensic_sci ence_report_final.pdf [https://perma.cc/862G-P9C4]. "Low-template," "low-copy-number," "touch," or "trace" DNA analysis all refer to "testing minuscule amounts of DNA that fall below the (somewhat amorphous) stochastic threshold—around 100 picograms or less." *United States v. Davis*, 602 F. Supp. 2d 658, 669 (D. Md. 2009).

(3) "DNA profile" means an analysis of genetic loci that have [sic] been validated according to standards established by:

> (i) The Technical Working Group on DNA Analysis Methods (TWGDAM); or
>
> (ii) The DNA Advisory Board of the Federal Bureau of Investigation.

(b) *In general.* — **A statement from the testing laboratory setting forth that the analysis of genetic loci has been validated by standards established by TWGDAM or the DNA Advisory Board** is sufficient to admit a DNA profile under this section.

(c) *Purposes.* — In any criminal proceeding, the evidence of a DNA profile is admissible to prove or disprove the identity of any person, if the party seeking to introduce the evidence of a DNA profile [complies with specified notice requirements].

CJP § 10-915 (1998) (emphasis added) (amended 2016). Ms. Charak's report contained the following statement of validation: "The DNA profiles reported below were determined by procedures which have been **validated according to the Federal Bureau of Investigation's Quality Assurance Standards** for Forensic DNA Testing Laboratories." (Emphasis added.)

The trial court conducted two hearings to determine the admissibility of the DNA evidence. First, the trial court held a hearing to determine whether the Prince George's County Laboratory was in compliance with the DNA Admissibility Statute, which would render the evidence automatically admissible without the need for a *Frye-Reed* hearing. At this initial hearing, the trial court determined that the Laboratory was not in compliance with the Statute, and therefore the DNA evidence was not automatically admissible. Next, the trial court conducted a *Frye-Reed* hearing to determine whether the Laboratory's methods of analysis were generally accepted as reliable within the relevant scientific

4

community. The trial court concluded that the Laboratory's methods satisfied this standard, and therefore the DNA evidence would be admissible at trial.

Mr. Phillips was tried before a jury beginning on January 14, 2013. The trial court admitted into evidence the analysis of the buccal swab and steering wheel sample, and Ms. Charak testified regarding her conclusions. On January 17, 2013, the jury convicted Mr. Phillips of the first-degree murders of Wynetta and Jaylin, and related charges. On March 22, 2013, the trial court sentenced Mr. Phillips to two consecutive terms of life imprisonment without the possibility of parole. Mr. Phillips appealed, and the Court of Special Appeals affirmed the convictions. *Phillips v. State*, 226 Md. App. 1, 4 (2015). Mr. Phillips then petitioned this Court for a writ of certiorari, requesting review of whether the lower courts erred in holding that the DNA evidence was admissible under *Frye-Reed*.[4] The State filed a conditional cross-petition, requesting review of whether the lower courts

---

[4] Mr. Phillips presented the following questions in his petition for writ of certiorari:

> 1. Under the *Frye-Reed* standard ("the basis of [a scientific] opinion must be shown to be generally accepted as reliable within the expert's particular scientific field") what is "generally accepted as reliable" in analyzing and interpreting complex mixtures of low template "touch" DNA?

> 2. In this case, was the Prince George's County Crime Lab's methodology, which lacked any protocols for the analysis and interpretation of complex mixtures of low template DNA, including a stochastic threshold, use of a non-validated filtration technique, and misuse of an inclusion probability calculation, "generally accepted as reliable" in the relevant scientific field?

> 3. Did the Court of Special Appeals improperly deviate from *Frye-Reed* by reaching a conclusion without considering evidence from the relevant scientific community, other than the two opinions expressed at a pretrial hearing?

erred in holding that the DNA evidence did not qualify for automatic admissibility under CJP § 10-915.[5]  We granted both the petition and the cross-petition on March 25, 2016. *Phillips v. State*, 446 Md. 704 (2016).

## STANDARD OF REVIEW

The trial court's determination that the Prince George's County Laboratory was not in compliance with the DNA Admissibility Statute, to the extent that this is a factual finding, will not be set aside unless clearly erroneous.  *See Bottini v. Dep't of Fin.*, 450 Md. 177, 187 (2016) ("We give due regard to the trial court's role as fact-finder and will not set aside factual findings unless they are clearly erroneous." (quoting *Breeding v. Koste*, 443 Md. 15, 27 (2015))).  However, "[w]hen the trial court's decision involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the [trial] court's conclusions are legally correct."  *Id.* (second alteration in original) (quoting *Breeding*, 443 Md. at 27).

## DISCUSSION

Mr. Phillips argues that the trial court erred in admitting the DNA evidence at trial because the State did not establish at the *Frye-Reed* hearing that the methods used by the Prince George's County Laboratory in conducting its analysis are generally accepted as reliable within the relevant scientific community.  Before we can address that argument,

---

[5] The State presented the following question in its conditional cross-petition:

> Did the Court of Special Appeals err in holding that compliance with Section 10-915 of the Courts and Judicial Proceedings Article required certification of meeting a nonexistent standard neither party advocated?

however, we must determine the threshold issue of whether Mr. Phillips was even entitled to a *Frye-Reed* hearing regarding the DNA evidence.

In Maryland, scientific evidence can become admissible either by statute, "if a relevant statute exists," or by establishing general acceptance in the relevant scientific community under *Frye-Reed*. *Armstead v. State*, 342 Md. 38, 54 (1996). Here, a relevant statute exists—the DNA Admissibility Statute, CJP § 10-915. The DNA Admissibility Statute provides that DNA evidence is admissible so long as certain notice requirements are met and the analysis is accompanied by "[a] statement from the testing laboratory setting forth that the analysis of genetic loci has been validated by standards established by TWGDAM or the DNA Advisory Board." CJP § 10-915 (1998) (amended 2016). "When the General Assembly has enacted legislation rendering evidence admissible, 'the only way to contest the validity of the underlying principles involved would be to argue that the statutes violate one's right to due process of law.'" *Armstead*, 342 Md. at 57 (quoting L. McLain, *Maryland Evidence § 401.4(c)*, at 278 (1987 & 1999 Cum. Supp.)). Mr. Phillips has not argued before this Court that the DNA Admissibility Statute violates his right to due process.[6] Thus, if the DNA evidence offered by the State at Mr. Phillips' trial satisfied the requirements of § 10-915, then Mr. Phillips was not entitled to a *Frye-Reed* hearing to

---

[6] At the initial hearing in the trial court to determine whether CJP § 10-915 applied, defense counsel argued that, even if the Statute did apply, Mr. Phillips would still be entitled to "a hearing pursuant to the Due Process Clause, because ultimately what the State is seeking to introduce is unreliable scientific evidence." However, Mr. Phillips waived his due process argument by failing to assert it either in his brief or at oral argument before this Court. *See Ricker v. Abrams*, 263 Md. 509, 516 (1971) (holding that appellant's failure to make an argument in her brief or at oral argument constitutes waiver of the argument). Accordingly, we will not address it.

determine its admissibility. Therefore, we must first determine whether the DNA evidence introduced against Mr. Phillips qualified for automatic admissibility under CJP § 10-915.

### A. *The Parties' Contentions and Lower Courts' Rulings*

Mr. Phillips argues that the DNA evidence was not automatically admissible under CJP § 10-915 because Ms. Charak's report was not accompanied by a statement that the analysis had "been validated by standards established by TWGDAM or the DNA Advisory Board," as required by the Statute. Instead, the report was accompanied by a statement that the Prince George's County Laboratory's procedures had "been validated according to the Federal Bureau of Investigation's Quality Assurance Standards for Forensic DNA Testing Laboratories." Mr. Phillips asserts that this statement of validation is not sufficient for automatic admissibility under the Statute.

The State responds that the DNA evidence was automatically admissible under CJP § 10-915 because Maryland law requires state forensics laboratories to adhere to the QAS for DNA testing. *See* Md. Code, Pub. Safety § 2-503(b) (requiring state laboratories to comply with federal standards for inclusion in the Combined DNA Index System). The two entities named in the Statute no longer exist, and the QAS are now the relevant standards. Therefore, the State asserts, a statement of validation that the Prince George's County Laboratory's procedures had been validated according to the QAS should be sufficient for automatic admissibility under CJP § 10-915.

The trial court agreed with Mr. Phillips that the Prince George's County Laboratory's statement of validation was not sufficient for automatic admissibility under the Statute. Because TWGDAM and the DNA Advisory Board were no longer in existence

8

at the time the Laboratory performed its analysis, the court found that TWGDAM's successor, "SWGDAM[,] is now the entity that sets forth the standards for DNA testing." The trial court then interpreted the Statute by "substituting" SWGDAM for TWGDAM, and held that compliance with SWGDAM guidelines was required for automatic admissibility under CJP § 10-915. The court found that SWGDAM had guidelines for interpreting complex DNA mixtures, which the Laboratory did not follow when it performed its analysis. Thus, the trial court held that the Laboratory's compliance with the QAS was not sufficient for automatic admissibility under CJP § 10-915, and proceeded to conduct a *Frye-Reed* hearing to determine whether the DNA evidence could be admitted at trial. The trial court ultimately determined that the DNA evidence was admissible under *Frye-Reed*, and the State introduced Ms. Charak's report and testimony at trial.

Before the Court of Special Appeals, Mr. Phillips asserted that the trial court's ruling on the State's noncompliance with § 10-915 was correct, but challenged the trial court's ruling on admissibility under *Frye-Reed*. In response, the State erroneously asserted that the trial court had found that the Prince George's County Laboratory's statement of validation was sufficient under the Statute, and therefore the court was precluded from even holding a *Frye-Reed* hearing to determine the admissibility of the DNA evidence. Neither party explicitly addressed how the appellate court should interpret § 10-915 in light of the fact that the two entities named in the Statute no longer exist.

The Court of Special Appeals framed the issue as "decid[ing] what to do with a statute that appears to be obsolete." *Phillips*, 226 Md. App. at 3. The court then presented a lengthy discussion of how to deal with obsolete statutes, *id.* at 8–12, an examination of

9

the legislative history of § 10-915, *id.* at 12–14, and a comparison of the current and previous standards-setting bodies for DNA testing. *Id.* at 14–16. Following this analysis, the Court of Special Appeals concluded that a DNA analysis would be automatically admissible under § 10-915 if accompanied by a statement of validation "pursuant to standards promulgated by SWGDAM." *Id.* at 15. In contrast, the court concluded that a DNA analysis conducted pursuant to the QAS would not be sufficient for automatic admissibility under the Statute. *Id.* at 16. In other words, the Court of Special Appeals agreed with the trial court's interpretation of § 10-915, and held that the lower court was correct in holding a *Frye-Reed* hearing to determine the admissibility of the DNA evidence. *Id.* The Court of Special Appeals then held, in agreement with the trial court, that the DNA evidence was admissible under *Frye-Reed*. *Id.* at 22. Mr. Phillips petitioned this Court to review the lower courts' rulings that the DNA evidence was admissible under *Frye-Reed*. The State filed a conditional cross-petition, seeking review of the lower courts' interpretation of § 10-915.

**B.    *Mootness***

After we granted certiorari on Mr. Phillips' petition and the State's cross-petition, Mr. Phillips filed a motion to dismiss the State's cross-petition as moot. Mr. Phillips argues that this Court need not decide whether the Court of Special Appeals' interpretation of § 10-915 is correct, because the version of the Statute that that court interpreted is no longer in effect. During the 2016 Legislative Session, the General Assembly passed an amendment to CJP § 10-915 so that the Statute now references the QAS, in addition to TWGDAM and the DNA Advisory Board, as providing the DNA testing standards that

10

must be followed for automatic admissibility. *See* 2016 Md. Laws, ch. 570. These changes to the statutory language were adopted directly in response to the Court of Special Appeals' opinion below. The State maintains that its cross-petition is not moot because there is still an existing controversy between the parties—namely, whether the State's DNA evidence was automatically admissible at Mr. Phillips' trial under the previous version of § 10-915. In addition, the State notes that the amended Statute applies only prospectively to offenses committed on or after the effective date of October 1, 2016, *see id.*, so this Court's resolution of how to interpret the previous version could potentially affect "many, many other pending cases" involving DNA evidence.

"A case is moot when there is no longer any existing controversy between the parties at the time that the case is before the [C]ourt, or when the [C]ourt can no longer fashion an effective remedy." *Green v. Nassif*, 401 Md. 649, 654 (2007) (quoting *In re Kaela C.*, 394 Md. 432, 452 (2006)). The Court does not issue advisory opinions, and thus moot cases are generally dismissed "without a decision on the merits." *Id.* at 655 (quoting *Dep't of Human Res., Child Care Admin. v. Roth*, 398 Md. 137, 143 (2007)).

Here, there is still an existing controversy between the parties. The controversy is whether the DNA evidence qualified for automatic admissibility at Mr. Phillips' trial pursuant to the previous version of § 10-915. Because § 10-915 was recently amended to make explicit that compliance with the QAS is sufficient for automatic admissibility, the parties' dispute over whether the Prince George's County Laboratory's compliance with the QAS was sufficient in this case would already be resolved if the offense had been committed on or after October 1, 2016. However, because the 2016 amendments to the

11

Statute apply only prospectively, we still must determine whether the Laboratory complied with the previous version of the Statute, which was in effect at all times relevant to this proceeding: when the charged offenses occurred, when the Laboratory performed its analysis, during the pre-*Frye-Reed* hearing, and during Mr. Phillips' trial.

Additionally, this Court can fashion an effective remedy by deciding the proper interpretation of the previous version of the Statute, and either affirming Mr. Phillips' convictions or reversing them and remanding the case for a new trial (if we were to also decide that the DNA evidence was not otherwise admissible, and that any error in admitting it was not harmless).

Because there is still an existing controversy between the parties, and the Court can fashion an effective remedy, we hold that the State's cross-petition, regarding the proper interpretation of § 10-915 before it was amended in 2016, is not moot. Accordingly, Mr. Phillips' motion to dismiss the State's cross-petition as moot is denied.

## C. Compliance with CJP § 10-915

Next, we address the merits of the State's contention that the lower courts erred in determining that the DNA evidence introduced against Mr. Phillips did not meet the requirements for automatic admissibility under the DNA Admissibility Statute. As set out above, CJP § 10-915(b) provided that "[a] statement from the testing laboratory setting forth that the analysis of genetic loci has been validated by standards established by TWGDAM or the DNA Advisory Board is sufficient to admit a DNA profile under this section." The Prince George's County Laboratory's analysis was accompanied by a statement that its procedures had "been validated according to the Federal Bureau of

Investigation's Quality Assurance Standards for Forensic DNA Testing Laboratories." We must determine whether this statement of validation satisfies the requirement of § 10-915(b).

Mr. Phillips maintains that the Prince George's County Laboratory's statement of validation is insufficient because it does not explicitly state that the Laboratory's analysis had been validated by standards established by TWGDAM or the DNA Advisory Board. In fact, Mr. Phillips asserts, the Laboratory's analysis could not possibly include such a statement because neither TWGDAM nor the DNA Advisory Board were in existence when the Laboratory performed its analysis in June 2011. The State counters that since TWGDAM and the DNA Advisory Board went defunct, state and federal law have required forensics laboratories to adhere to the QAS. Therefore, the State concludes, although the DNA Admissibility Statute does not explicitly mention the QAS, the Laboratory's compliance with those standards should be deemed sufficient for automatic admissibility of the DNA evidence.

The trial court found as a matter of fact, and the Court of Special Appeals agreed, that TWGDAM and the DNA Advisory Board were no longer in existence when the Prince George's County Laboratory performed its analysis in June 2011. *See Phillips*, 226 Md. App. at 8, 15. The trial court also found as a matter of fact, and the Court of Special Appeals agreed, that the Scientific Working Group on DNA Analysis Methods, or SWGDAM, is the successor entity to TWGDAM. *Id.* at 14. Then, after examining the legislative history of the DNA Admissibility Statute, the Court of Special Appeals determined "that the legislature intended to create a statute that would track cutting-edge

13

DNA science and ensure automatic admissibility only if the DNA techniques complied with the standards promulgated by the most rigorous standards-setting body available." *Id.* Next, the Court of Special Appeals compared SWGDAM guidelines for DNA testing to the QAS, just as the trial court had done. *Id.* The intermediate appellate court noted that while SWGDAM guidelines represent "rigorous standards for cutting-edge DNA technology," *id.* at 15, the QAS are simply "older protocols that are 'good enough.'" *Id.* at 16. The Court of Special Appeals then concluded (as had the trial court) that while a DNA analysis conducted in accordance with SWGDAM guidelines would be sufficient for automatic admissibility under the Statute, one that was conducted in accordance with the QAS was not. *Id.* at 15–16. Therefore, the Court of Special Appeals held that the Laboratory's statement of validation was not sufficient under CJP § 10-915(b). *Id.* at 16.

The arguments from both Mr. Phillips and the State, as well as the conclusions of the trial court and the intermediate appellate court, appear to be premised on a misunderstanding of the evolution of TWGDAM, SWGDAM, the DNA Advisory Board, and the QAS, and the relationship between these entities and the DNA Admissibility Statute. In order to resolve this confusion, we will examine the interrelated histories of these standards-setting bodies, and view them in the context of the legislative history of the DNA Admissibility Statute. In doing so, we begin by setting forth this Court's well-established rules of statutory construction.

This Court provides judicial deference to the policy decisions enacted into law by the General Assembly. We assume that the legislature's intent is expressed in the statutory

language and thus our statutory interpretation focuses primarily on the language of the statute to determine the purpose and intent of the General Assembly.

> We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory. If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends. Occasionally we see fit to examine extrinsic sources of legislative intent merely as a check of our reading of a statute's plain language. In such instances, we may find useful the context of a statute, the overall statutory scheme, and archival legislative history of relevant enactments.

*Douglas v. State*, 423 Md. 156, 178 (2011) (quoting *Evans v. State*, 420 Md. 391, 400 (2011)).

The General Assembly enacted CJP § 10-915 in 1989 to eliminate the need for costly *Frye-Reed* hearings in every case for which the State sought to admit DNA evidence. *Armstead*, 342 Md. at 57. Rather than continually relitigating whether DNA evidence had achieved "general acceptance in the relevant scientific community" under *Frye-Reed*, § 10-915 provided that DNA evidence is automatically admissible, so long as certain conditions are met. *Id.* at 58. The 1991 version of the Statute specifically allowed for the automatic admissibility of DNA evidence that was analyzed according to the restriction fragment length polymorphism ("RFLP") method. CJP § 10-915 (1991) (amended 1997). But by 1997, the RFLP method had become outdated, and was superseded by a new technique called the polymerase chain reaction ("PCR") method. Jud. Proc. Comm., *Bill Analysis: House Bill 414* (1997). Because the 1991 Statute specified only that DNA evidence analyzed using RFLP was automatically admissible, state's attorneys seeking to admit PCR

DNA evidence were once again forced to establish its admissibility under *Frye-Reed* on a case-by-case basis. *Id.*

The General Assembly again sought to eliminate the need for *Frye-Reed* hearings for every piece of DNA evidence by amending the Statute to reflect the advancements that had occurred in the field of DNA analysis. *Id.* Initially, the legislature proposed to do this by simply inserting the PCR method into the Statute alongside the RFLP method, such that an analysis conducted utilizing either method would qualify for automatic admissibility. *See* House Bill 414 – First Reading, 1997 Leg., 411th Sess. (Md. Jan. 24, 1997) ("'DNA profile' means an analysis that utilizes the restriction fragment length polymorphism analysis OR POLYMERASE CHAIN REACTION of DNA resulting in the identification of an individual's [patterned] chemical structure of genetic information." (capitalization in original to show addition to existing law) (brackets in original to show deletion from existing law)). Before the bill was passed, however, it was amended to define "DNA profile" as "an analysis of genetic loci that have [sic] been validated according to standards established by . . . (I) . . . TWGDAM; or (II) The DNA Advisory Board." House Bill 414, 1997 Leg., 411th Sess. (Md. 1997). Additionally, a statement from the testing laboratory that the analysis had been validated accordingly would be sufficient for automatic admissibility. *Id.*

Thus, rather than replace the RFLP method with PCR or any other specified method of analysis, the General Assembly chose to delegate the power to approve new DNA analysis techniques to two national standards-setting bodies: TWGDAM and the DNA Advisory Board. While the Bill File for House Bill 414 (1997) does not expressly state the

16

reasoning behind these amendments, we infer that, given the Statute's history, legislators had realized that the science of DNA analysis was rapidly evolving, and any attempt by the legal system to keep up would inevitably fall short. In effect, the General Assembly decided that if a new technique was good enough for approval by one of these two entities, then it was good enough for automatic admissibility in Maryland courts.[7]

TWGDAM was a group of private and public sector forensic scientists convened by the FBI in 1988 to establish guidelines for DNA testing in forensic laboratories throughout the country. Dep't Legis. Servs., *Fiscal and Policy Note (Revised), Senate Bill 637*, at 2 (2016 Session).[8] These "guidelines became de facto standards and were recognized by courts as minimum requirements for a quality forensic DNA analysis program." SWGDAM, *About Us*.[9]

The DNA Identification Act of 1994 authorized the creation of the DNA Advisory Board to develop and revise, as appropriate, "recommended standards for quality assurance, including standards for testing the proficiency of forensic laboratories, and forensic analysts, in conducting analyses of DNA." 42 U.S.C. § 14131(a) (1994). This legislation also provided that, "[u]ntil such time as the advisory board has made recommendations to the Director of the Federal Bureau of Investigation and the Director

---

[7] The Statute was amended again in 1998 without substantive change, and that version remained in force until October 1, 2016. *See* 1998 Md. Laws, ch. 21 (revising reference to "Maryland Rules of Criminal Procedure" in subsection (e) to "Maryland Rules").

[8] http://mgaleg.maryland.gov/2016RS/fnotes/bil_0007/sb0637.pdf [https://perma.cc/Q46R-BXYX].

[9] http://www.swgdam.org/about-us [https://perma.cc/2ZYK-CB2A].

has acted upon those recommendations, the quality assurance guidelines adopted by the technical working group on DNA analysis methods [(TWGDAM)] shall be deemed the Director's standards." § 14131(a)(4).

Pursuant to this legislation, the FBI Director established the DNA Advisory Board, which began developing standards for DNA testing in 1995. SWGDAM, *History & Evolution of DNA QA Standards* 19 (2015).[10] The DNA Advisory Board issued two sets of standards for forensics laboratories to follow. In July 1998, the Board issued the *Quality Assurance Standards for Forensic DNA Testing Laboratories*, effective October 1, 1998.[11] *Id.* at 20. In April 1999, the Board issued the *Quality Assurance Standards for Convicted Offender DNA Databasing Laboratories*, effective April 1, 1999.[12] *Id.* Collectively, these two documents are known as the FBI's Quality Assurance Standards, or the QAS.

Unfortunately, the General Assembly's attempt to keep the law on pace with scientific advancements encountered unforeseen complications. In 1999, TWGDAM was renamed the Scientific Working Group on DNA Analysis Methods, or "SWGDAM." SWGDAM, *History & Evolution of DNA QA Standards*, *supra* at 3. In December 2000,

---

[10] http://media.wix.com/ugd/4344b0_2a8cb7c430304940853bd73b18772f23.pdf [https://perma.cc/2BHD-JQN9].

[11] FBI, *Quality Assurance Standards for Forensic DNA Testing Laboratories*, https://archives.fbi.gov/archives/about-us/lab/forensic-science-communications/fsc/july2000/quality-assurance-standards-for-forensic-dna-testing-laboratories [https://perma.cc/7BCV-GH3C].

[12] FBI, *Quality Assurance Standards for Convicted Offender DNA Databasing Laboratories*, https://archives.fbi.gov/archives/about-us/lab/forensic-science-communications/fsc/july2000/codis1a.htm [https://perma.cc/UB4M-YP89].

the DNA Advisory Board expired at the end of its statutory term and transferred its responsibility for recommending revisions to the QAS to SWGDAM. *Id.* at 22; *see also* § 14131(b)(4) ("The board shall cease to exist on the date 5 years after the initial appointments are made to the board . . . ."). Thus, by December 2000, both of the standards-setting bodies named in the DNA Admissibility Statute had ceased to exist, at least under the names specified in the Statute.

Recognizing this discrepancy in the statutory language, the General Assembly twice attempted to amend CJP § 10-915 between 2000 and 2015. In 2001, House Bill 857 proposed to amend the Statute by simply replacing all references to "TWGDAM" with "SWGDAM." House Bill 857, 2001 Leg., 415th Sess. (Md. 2001). DNA evidence would remain automatically admissible under the Statute if the analysis had "been validated by standards established by [TWGDAM] SWGDAM or the DNA Advisory Board." *Id.* (brackets in original to show deletion from existing law). The House Judiciary Committee gave the Bill an unfavorable report, and no further action was taken. General Assembly of Maryland, *Bill Info – House Bill 857*.[13]

In 2006, House Bill 274 proposed to amend the DNA Admissibility Statute by replacing both of the named entities—TWGDAM and the DNA Advisory Board—with the QAS. House Bill 274, 2006 Leg., 421st Sess. (Md. 2006). "DNA profile" would be defined as "an analysis of genetic loci that have [sic] been validated according to national

---

[13]  http://mgaleg.maryland.gov/webmga/frmMain.aspx?tab=subject3&ys=2001rs/billfile/hb0857.htm [https://perma.cc/GV7D-E4FM].

quality assurance standards issued by the Director of the Federal Bureau of Investigation." *Id.* Additionally, DNA evidence would remain automatically admissible if the analysis had "been validated according to standards issued by the Director of the Federal Bureau of Investigation." *Id.*

The Fiscal and Policy Note accompanying House Bill 274 notes that "[t]he Department of State Police advises that the changes are technical in nature and do not change the standards for admissibility in court." Dep't Legis. Servs., *Fiscal and Policy Note, House Bill 274*, at 2 (2006 Session).[14] The Office of the Public Defender ("OPD") opposed the Bill, and proposed that SWGDAM, rather than the QAS, should replace TWGDAM and the DNA Advisory Board in the Statute. OPD, *Position on Proposed Legislation – House Bill 274* (Feb. 15, 2006). OPD explained that "[t]he SWGDAM entity is expected to exist for the foreseeable future, reflects the views of the national forensic science community as opposed to only those of the Director of the FBI and is the only logical set of guidelines on which to base this legislation." *Id.* The Maryland State Bar Association ("MSBA") also opposed the Bill, and similarly stated that "while SWGDAM communicates among its members and updates its scientific findings regularly, the FBI does not do so. To subject DNA evidence to standards approved in 1998 and 1999 by the FBI ignores scientific developments which have been discovered since that time." MSBA, *Position on House Bill 274* (Feb. 22, 2006). The Bill passed the House and received a

---

[14] http://mgaleg.maryland.gov/2006rs/fnotes/bil_0004/hb0274.pdf [https://perma.cc/F6KY-HQ9Z].

hearing in the Senate Judicial Proceedings Committee, but no further action was taken. General Assembly of Maryland, *Bill Info – House Bill 274*.[15]

Meanwhile, the QAS issued by the DNA Advisory Board in 1998 and 1999 remained in force as the minimum requirements for DNA testing in forensics laboratories throughout the country. The DNA Identification Act requires all DNA laboratories that are federally funded or operated, or participate in the National DNA Index System, to demonstrate compliance with the QAS. FBI, *Combined DNA Index System (CODIS)*.[16] The FBI monitors laboratories' compliance with the QAS through its annual audit process. Every other year, forensics laboratories must undergo an external audit to ensure that their procedures comply with the QAS. During in-between years, the laboratories are permitted to undertake an internal audit, where the laboratories' own scientists evaluate their procedures for compliance with the QAS. At the pre-*Frye-Reed* hearing in this case, Ms. Charak testified that the National Forensic Science Technology Center performed an external audit on the Prince George's County Laboratory in July 2010, and determined that the Laboratory was in compliance with the QAS.

Also during this time, SWGDAM continued its duty of periodically recommending revisions to the QAS to reflect scientific and technological advancements in DNA testing. SWGDAM, *About Us*, *supra*. In 2007, SWGDAM submitted to the FBI Director its

---

[15] http://mgaleg.maryland.gov/webmga/frmMain.aspx?tab=subject3&ys=2006rs/billfile/hb0274.htm [https://perma.cc/3SB3-TZL9].

[16] https://www.fbi.gov/services/laboratory/biometric-analysis/codis [https://perma.cc/T9KU-QQ5C].

recommendation for substantial revisions to the QAS. The FBI Director adopted these recommendations and issued the first revised QAS in October 2008, with an effective date of July 1, 2009.[17] SWGDAM, *History & Evolution of DNA QA Standards*, *supra* at 31. In 2011, SWGDAM submitted its recommendation for additional, minor revisions to the QAS, which were approved by the FBI Director with an effective date of September 1, 2011. *Id.* at 38–39. Thus, the 2007 version of the QAS were the relevant standards when the Prince George's County Laboratory performed its analysis in this case (in June 2011), and when it was audited by the National Forensic Science Technology Center (in July 2010).

This history makes pellucid that the lower courts were correct in finding that TWGDAM and the DNA Advisory Board did not exist under those names at the time the Prince George's County Laboratory received its statement of validation, or at the time the analysis in this case was performed. However, that finding is not dispositive of whether the Laboratory's analysis satisfied the requirement of CJP § 10-915(b). All that is required for automatic admissibility under that provision is "[a] statement from the testing laboratory setting forth that the analysis of genetic loci has been validated by standards established by TWGDAM or the DNA Advisory Board." § 10-915(b). The Statute does not require that either of these entities remain in existence at the time the procedures are

---

[17] FBI, *Important Notice of Revised Quality Assurance Standards for Forensic DNA* (2008), https://ucr.fbi.gov/lab/forensic-science-communications/fsc/oct2008/index.htm/standards/2008_10_standards01.htm [https://perma.cc/AX56-2HJL].

validated, or when the analysis is performed. As long as the laboratory's procedures have been validated by standards previously established by one of these entities, and the analysis is performed in accordance with those validated procedures, then the analysis qualifies for automatic admissibility under the Statute.

Although the QAS are not explicitly mentioned in the DNA Admissibility Statute (before the 2016 amendments), they are literally "standards established by . . . the DNA Advisory Board." As described above, the QAS are two sets of standards for DNA testing and databasing promulgated by the DNA Advisory Board in 1998 and 1999, respectively. And while the FBI Director revised the QAS in 2007 at the recommendation of SWGDAM, we do not believe that these subsequent revisions, by an entity not explicitly named in the statute, transform the 2007 QAS into something other than "standards established by . . . the DNA Advisory Board."

Furthermore, we view the General Assembly's decision not to amend the Statute between 2000 and 2015, despite multiple proposals, as an indication that legislators did not view the Statute as "obsolete" or ineffective. To the contrary, this inaction illustrates that the previous version of the Statute continued to serve its purpose of allowing for the automatic admissibility of DNA evidence without the need for *Frye-Reed* hearings. It was not until the Court of Special Appeals interpreted the Statute as "obsolete" that the General Assembly decided to amend the Statute for clarification. The 2016 amendments made clear that, although the standards-setting bodies named in the Statute no longer exist under those names, the standards they promulgated remain in effect.

Therefore, we hold that the Prince George's County Laboratory's statement of validation, that the DNA analysis in this case was "determined by procedures which have been validated according to the Federal Bureau of Investigation's Quality Assurance Standards for Forensic DNA Testing Laboratories," satisfies the requirement of CJP § 10-915(b).

### D.      *Adequacy of the QAS*

Alternatively, Mr. Phillips argues that even if compliance with the QAS is sufficient for automatic admissibility under CJP § 10-915, it should not be sufficient to admit the particular DNA analysis performed in this case because the QAS do not have standards pertaining to complex, low-template DNA.  The State responds that while the QAS do not specifically address complex, low-template DNA, they also do not preclude analyses of this category of DNA evidence.  Therefore, the State asserts, because the Prince George's County Laboratory followed all applicable QAS when performing its analysis, the DNA evidence qualifies for automatic admissibility under CJP § 10-915.

At the pre-*Frye*-*Reed* hearing, Ms. Charak—testifying for the State—and Dr. Charlotte Word—testifying for Mr. Phillips—generally agreed that the QAS do not specifically address complex, low-template DNA.  Dr. Word testified that the QAS do not distinguish between "two-person mixture[s], three-person mixtures, four-person mixtures, good quality DNA, [or] low quality DNA."  Ms. Charak, when asked if she was "aware of a standard that has been generally accepted within the scientific community for reliably interpreting complex mixtures of low template DNA," responded, "A standard?  There is no such standard."  Additionally, the trial court found that there were SWGDAM guidelines

24

"in place as of 2009" that dealt with complex DNA mixtures, but these guidelines had not yet been adopted by the FBI Director and incorporated into the QAS. The trial court also found that the Prince George's County Laboratory was not following the SWGDAM guidelines, and that it did "not have specific protocols as it relates to the complex mixtures that are addressed in this case."

The trial court's findings that the QAS did not address complex, low-template DNA and that the Prince George's County Laboratory did not have any protocols for analyzing this category of DNA, are not clearly erroneous; however, those findings are not relevant to the admissibility of DNA evidence under CJP § 10-915. All that is required for admissibility under the Statute is "[a] statement from the testing laboratory setting forth that the analysis of genetic loci has been validated by standards established by TWGDAM or the DNA Advisory Board," and compliance with the notice requirements. As we stated above, the Laboratory satisfied these requirements with respect to the DNA evidence admitted against Mr. Phillips. Therefore, the DNA evidence was automatically admissible under the Statute.

In essence, Mr. Phillips argues that mere compliance with the DNA Admissibility Statute is not good enough for automatic admissibility when the DNA analysis at issue is not covered by any applicable standards. However, the legislative history detailed above and the recent amendments to the Statute make clear that CJP § 10-915 was not intended to be a "best practices" statute. In 2006, both OPD and the MSBA opposed amending the Statute to state that compliance with the QAS is sufficient for automatic admissibility. Both organizations asserted that SWGDAM was the proper standards-setting body because

25

their guidelines reflect ongoing scientific development, whereas the QAS do not. *See* OPD, *Position on Proposed Legislation – House Bill 274*, *supra*; MSBA, *Position on House Bill 274*, *supra*. Similarly, at the Senate Judicial Proceedings Committee hearing on the 2016 proposed amendments to the Statute, Stephen Mercer, Chief Attorney of the Forensics Division of OPD,[18] testified that the Statute should be amended such that compliance with SWGDAM guidelines is required for automatic admissibility. *Evidence – Admissibility of DNA Profile – Definition and Validation of DNA Profile: Hearing on Senate Bill 637 Before Senate Committee on Judicial Proceedings*, 2016 Leg., 436th Sess. (Md. 2016) (statement of Stephen Mercer, Chief Attorney, Forensics Division, OPD).[19] Mr. Mercer noted that the SWGDAM guidelines apply to "cutting-edge" DNA technology, while the QAS do not. *Id.*

Despite these objections, the General Assembly passed and Governor Hogan signed Senate Bill 637, which made explicit that compliance with the QAS is sufficient for the automatic admissibility of DNA evidence. *See* 2016 Md. Laws, ch. 570. The current Statute does not mention SWGDAM. We view this as an indication that CJP § 10-915 was not intended to be a "best practices" statute, such that only DNA evidence that has been analyzed in accordance "with the standards promulgated by the most rigorous standards-setting body available" would qualify for automatic admissibility. *See Phillips*, 226 Md.

---

[18] Mr. Mercer represented Mr. Phillips throughout the pretrial proceedings and at trial.

[19] http://mgahouse.maryland.gov/mga/play/ec1ad150-0f06-4f22-863e-a35337cd142b/?catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c&playfrom=12450000 [https://perma.cc/5542-DPUM].

App. at 14. Instead, the DNA Admissibility Statute allows for the admission of any DNA evidence, both cutting-edge and traditional, without the need to establish its general acceptance and reliability under *Frye-Reed*, so long as the analysis was performed in accordance with the minimum requirements promulgated by the FBI. The Prince George's County Laboratory's analysis complied with these minimum requirements; that the federal standards do not specifically address analyses of complex, low-template DNA samples is immaterial to admissibility under the Statute.

That the DNA evidence was automatically admissible under the Statute does not mean that Mr. Phillips was entirely unable to challenge such evidence. Mr. Phillips could have attacked the weight to be given the DNA evidence based on the lack of an accepted standard for analyzing complex, low-template DNA samples by either cross-examining Ms. Charak at trial or calling a rebuttal expert as he did at the pretrial hearings. In fact, defense counsel did cross-examine Ms. Charak regarding her qualifications to perform this type of analysis and questioned the legitimacy of some of the methodologies she employed. However, Mr. Phillips did not present his rebuttal expert, Dr. Word, to fully explain the alleged issues with the analysis that Ms. Charak performed. As the Court of Special Appeals noted, "[w]e find it telling that [Mr.] Phillips chose not to do so." *Id.* at 23.

## CONCLUSION

We hold that the statement of validation that accompanied the Prince George's County Laboratory's analysis of the DNA evidence introduced against Mr. Phillips satisfied the requirement of CJP § 10-915(b), and therefore the DNA evidence was automatically admissible. The trial court erred in conducting a *Frye-Reed* hearing to

27

determine the admissibility of the DNA evidence, but that error was harmless because the trial court ultimately reached the correct conclusion that the DNA evidence was admissible. Accordingly, we affirm the judgment of the Court of Special Appeals.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**