*Kevin Whittington v. State*,
No. 2591, Sept. Term, 2018, Opinion by Leahy, J.


**Fourth Amendment > Search > GPS Tracking**

We hold that a court order issued under CP § 1.203.1, meets the requisites of a warrant under Fourth Amendment Law. The statute requires that an order be signed by a neutral and detached magistrate, based on probable cause, and supported by oath or affirmation. It must also identify, with reasonable particularity, the technology to be employed and the person about whom location information is being sought.  Such order is limited, unless certain exceptions apply, to 30 days, after which notice of the order must be delivered to the subject of the order.


**Fourth Amendment > Search > GPS Tracking**

In this age of rapidly advancing surveillance technology, that CP § 1-203.1 incisively requires that an application for an order, such as the GPS Order in this case, be limited to 30 days and describe with reasonable particularity the type of electronic device to be employed by law enforcement.


**Fourth Amendment > Orders**

We reject any categorical proposition that an "order" issued by a neutral magistrate cannot serve as the functional equivalent of a "warrant" issued by a neutral magistrate.  We recognize that formal labels are necessary to organize the ontology of the law, but, in this case, as in most, the label is not dispositive.

**Fourth Amendment > Search > Warrants > GPS Tracking**

In *United States v. Jones*, the Supreme Court held that a GPS device affixed by law enforcement on a suspect's vehicle to monitor his movements constituted a search under the Fourth Amendment.  565 U.S. 400, 404 (2012).  Although the Supreme Court in *Jones* did not specifically address whether police must obtain a warrant before installing a GPS tracking device on a suspect's vehicle, we accept that the "Fourth Amendment's prohibition against unreasonable searches is generally satisfied when law enforcement officers obtain a warrant authorizing the search in question." *State v. Copes*, 454 Md. 581, 618 (2017) (citing *Riley v. California* 573 U.S. 373, 382 (2014)).

**Fourth Amendment > Searches > Warrants > Burden**

In warrantless-search and-seizure cases, the State bears the burden of overcoming the presumption that a warrant was required. *Eusebio v. State*, 245 Md. App. 1, 22 (2020) (citation omitted). In the instant case, the State had the burden of establishing that the order issued pursuant to CP § 1-203.1 met the requirements of a warrant.

**Fourth Amendment > Searches > Warrants > Particularity > Surveillance Technology**

In our effort to stay apace with scientific advances, we have recognized that in order for a neutral magistrate to "particularly describe[e] the place to be searched, and the persons or things to be seized," the application for a warrant or order must identify, among other things, what type of tracking device law enforcement intends to use. *See State v. Andrews*, 227 Md. App. 350, 376 (2016).

**Statutes > Statutory Interpretation > Plain Language**

To determine Legislative intent, we turn first to the plain meaning of the statute. *Berry v. State*, 244 Md. App. 234, 244 (2019). "Even if the plain meaning is clear and unambiguous, we often look to legislative intent and purpose to determine if they ratify our analysis and interpretation of a statute." *Hammonds v. State*, 436 Md. 22, 44 (2013).

**Statutes > Statutory Interpretation > Plain Language**

The plain language of CP § 1.203.1 shows that the statute embodies all of the warrant requirements inhering in the Fourth Amendment. Subsection b provides, in pertinent part, that a court may issue an order that allows law enforcement to obtain location information "after determining[,] from an application described in paragraph (2) of this subsection[,]" that "there is probable cause to believe that . . . a misdemeanor or felony has been, is being, or will be committed . . . by the individual about whom location information is being sought[.]" CP § 1-203.1(b)(1)-(1)(i). Paragraph (2) requires a written application that is "signed and sworn to by the applicant" and is "accompanied by an affidavit that[] . . . sets forth the basis for probable cause . . . and [] contains facts within the personal knowledge of the affiant." CP § 1-203.1(b)(2).

**Statutes > Statutory Interpretation > Plain Language**

In light of the particularity requirement, the statute requires that any order issued pursuant to it must "describe with reasonable particularity[] . . . the type of electronic device associated with the location information being sought"; "the user of the electronic device, if known, or the identifying number of the electronic device about which location

information is sought"; and "the grounds for obtaining the location information[.]"  CP § 1-203.1(b)(3).

**Statutes > Constitutionality**

We observe that CP § 1-203.1, tailored to address modern tracking technology, imposes time limitations and requires concise identification of the technology that law enforcement plans to employ in collecting location data—requisites that further aid in protecting citizens from indiscriminate government surveillance.

**Fourth Amendment > Searches > Warrants > Sufficiency of the Warrant**

CP § 1-203.1 imposes conditions and requisites on officers who seek to employ GPS tracking devices that meet the warrant requirements of the Fourth Amendment.  The application in this case demonstrated that the order issued established a substantial basis upon which the issuing judge could find probable cause that a "misdemeanor or felony . . . [wa]s being . . . committed" and "the location information being sought . . . [wa]s evidence of, or w[ould] lead to evidence of, the misdemeanor or felony being investigated[.]"  CP § 1-203.1(b).

**Fourth Amendment > Exclusionary Rule > Good Faith Exception**

We agree with the court's determination that the detectives in this case relied on the search warrant in good faith.  We assume, without deciding, that the suppression court correctly determined that the district court judge did not have a substantial basis to find probable cause to issue the warrant.  *See Marshall v. State*, 415 Md. 399, 402 (2010) (assuming that the search warrant was issued improperly and analyzing only the application of the good faith exception).

**Fourth Amendment > Exclusionary Rule > Good Faith Exception**

The United States Supreme Court and the Maryland Court of Appeals "have adopted a good faith exception to the warrant requirement, under which 'evidence seized under a warrant subsequently determined to be invalid may be admissible if the executing officers acted in objective good faith with reasonable reliance on the warrant.'"  *Carroll v. State*, 240 Md. App. 629, 654 (2019) (citation omitted).

**Fourth Amendment > Exclusionary Rule > Good Faith Exception**

The exclusionary rule it is "not applied when law enforcement officials engage in 'objectively reasonable law enforcement activity,' even if that activity is later found to be a violation of the Fourth Amendment."  *State v. Copes*, 454 Md. 581, 606 (2017) (quoting *Leon*, 468 U.S. at 919).

**Fourth Amendment > Exclusionary Rule > Good Faith Exception**

The detectives here could have reasonably believed that Appellant's criminal history, consistent association with a person of interest in a large-scale drug investigation, and suspicious driving behavior "related to a present and continuing violation of the law[.]" *Patterson v. State*, 401 Md. 76, 107 (2007).

Circuit Court for Baltimore County
Case No. 03-K-17-000239

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2591

September Term, 2018

_____

KEVIN WHITTINGTON

v.

STATE OF MARYLAND

_____

Leahy,
Shaw Geter,
Vitale, Cathleen M.
     (Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed:  July 1, 2020

 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

"GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations."
*United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J., concurring)

Law enforcement's use of a Global Positioning System ("GPS") tracking device led to the arrest and conviction of Kevin Whittington, and ultimately, to the Fourth Amendment issues before us now. As a matter of first impression, we examine whether the court order that authorized police to install the GPS tracking device on Mr. Whittington's car, issued pursuant to a state criminal statute, satisfied the Fourth Amendment requirements of a warrant based on probable cause.

Mr. Whittington unwittingly garnered the attention of detectives in the Harford County Sheriff's Office in 2016 by associating with a suspected narcotics distributor named David Hall. The detectives wiretapped Mr. Hall's phone and discovered that Mr. Whittington was the most frequent caller. Then they observed the two men engaged in activity that was consistent with the distribution of controlled dangerous substances (CDS). The detectives applied for and obtained an "Electronic Device Location Information Order" (hereinafter "GPS Order") under Maryland Code (2018 Repl. Vol., 2019 Supp.), Criminal Procedure Article ("CP"), § 1-203.1.[1] The GPS Order authorized the detectives to install a GPS mobile tracking device on Mr. Whittington's car for a 30-day period.

---

[1] The Maryland General Assembly first enacted the law, now codified as Section 1-203.1 of the Criminal Procedure Article, in 2014. 2014 Md. Laws Ch. 191 (S.B. 698). The statute was amended without substantive change in 2018 and 2019; however, during the 2020 legislative session, the General Assembly amended the statute to specify that it applies to law enforcement's use of cell site simulator technology. 2020 Md. Laws Ch. 222 (H.B. 499).

The detectives observed Mr. Whittington over a period of weeks with the help of the GPS tracking device. His pattern of movements further bolstered their assessment that he was engaged in CDS activity in and around Harford County, and that he maintained a residence at 4 Cloverwood Ct., Apt. 202, in Essex, Baltimore County. They then applied for and received a warrant to search Mr. Whittington's person, car, and apartment. The police found four baggies of cocaine totaling about eight grams in Mr. Whittington's car; and they found two bags of cocaine weighing approximately 145.9 grams, ten Alprazolam pills, and $1,222 in the apartment at 4 Cloverwood Ct. Officers apprehended Mr. Whittington at another location and found $1,406 and two cellular telephones on his person. Mr. Whittington was arrested and later indicted on January 18, 2017, in the Circuit Court for Baltimore County, on two counts of Possession of CDS with the Intent to Distribute and two counts of Possession of CDS.

Mr. Whittington filed a motion to suppress all the evidence derived from the searches conducted pursuant to the search warrant, which, he claimed, was issued upon evidence obtained from an "unconstitutional" order authorizing the detectives' use of the GPS tracking device. The GPS Order, he argued, lacked probable cause and was unconstitutional under the holding in *United States v. Jones*, 565 U.S. 400 (2012), which, he claimed, requires law enforcement to obtain a valid warrant in order to attach a GPS tracking device to a suspect's vehicle. He further argued that the evidence presented to the warrant court failed to establish a nexus between his alleged drug dealings and 4 Cloverwood Ct., Apt. 202, as required under *Agurs v. State*, 415 Md. 62 (2010). The circuit

court denied the motion.[2] Mr. Whittington timely appealed and presents two questions for our review, which we have reordered:

I.  "Did the circuit court err in denying Mr. Whittington's motion to suppress all evidence obtained from the warrantless use of a GPS device on his vehicle?"

II.  "Did the circuit court err in denying Mr. Whittington's motion to suppress all evidence seized from 4 Cloverwood Ct., Apt. 202 and Mr. Whittington's Dodge Stratus by finding that the good faith exception to the 4th Amendment exclusionary rule applied?"

First, we hold that the GPS Order issued under CP § 1-203.1 met the requisites of a warrant under Fourth Amendment law. The GPS Order was signed by a neutral and detached magistrate; upon an application signed under oath by someone with personal knowledge of the facts; which set forth the basis for probable cause to believe that a crime had been, or was going to be committed; and identified with particularity the person about whom location information was being sought and the vehicle on which the GPS device would be installed. We also conclude, in this age of rapidly advancing surveillance technology, that CP § 1-203.1 incisively adds the requirements that an application for an order, such as the GPS Order in this case, be limited to 30 days and describe with reasonable particularity the type of electronic device to be employed by law enforcement.

Second, we affirm the circuit court's ruling that the detectives relied in good faith on the search warrant and, therefore, we do not need to reach the question of whether the

---

[2] Mr. Whittington entered a conditional guilty plea pursuant to Maryland Rule 2-242(d) to Count 1 of the Criminal Indictment charging Possession of CDS with the Intent to Distribute and retained his ability to appeal the denial of the motion to suppress. The State entered *nolle prosequi* on the remaining counts.

3

warrant application failed to establish a nexus between Mr. Whittington's alleged drug dealings and 4 Cloverwood Ct., Apt. 202. Discerning no error in the court's determination that suppression was not an appropriate remedy in this case, we affirm the circuit court's denial of Mr. Whittington's motion to suppress.

## BACKGROUND

The following factual account is drawn from the evidence that was before the suppression court on September 18, 2018. Section A, recounting the initial investigation, draws upon facts presented in the application for the GPS Order that was issued by the District Court sitting in Harford County on October 8, 2016. Section B summarizes the averments set forth in the warrant affidavit in support of the warrant issued by the District Court sitting in Harford County on October 24, 2016.

### A. Initial Investigation and Court Order

Harford County Police Department detectives Brandon Underhill and Sam Vivino were assigned to the Harford County Narcotics Task Force in 2007 and 2012 respectively. In 2016, as part of a large-scale drug investigation, they began investigating a cocaine supplier in the region by the name of David Hall. Mr. Whittington was identified because of his association with Mr. Hall, although Det. Underhill was already familiar with Mr. Whittington because the Harford County Sheriff's Office had arrested him in 2015 for possession of over three ounces of cocaine.

On October 8, 2016, Det. Underhill submitted an application in the District Court, signed under oath, for an order to attach an electronic monitoring device—in this case, a GPS tracking device—onto Mr. Whittington's vehicle for 30 days. In support of the

4

application, Det. Underhill described the probable drug-related activities and interactions that the police had recently observed involving Mr. Whittington and Mr. Hall.

Beginning on July 5, 2016, Detectives Underhill and Vivino surveilled Mr. Whittington and Mr. Hall as they departed the Rossville Shopping Center in Baltimore County in Mr. Whittington's Dodge Stratus. Det. Underhill averred that "based [on the] detectives' familiarization with the area[,] Hall and Whittington often took very unusual courses of travel to reach destinations. It appeared that they were attempting to see if they were being followed by making loops and u-turns, which is a technique often employed by drug dealers." "Because of these evasive driving maneuvers, surveillance was terminated."

On October 4, 2016, the detectives began a wiretap on Mr. Hall's cell phone. The wiretap revealed that Mr. Whittington's phone number was the "highest volume communicator" with Mr. Hall. In the application for the GPS Order, Det. Underhill stated he believed Mr. Whittington and Mr. Hall were using coded language consistent with CDS activity and discussing locations that the detectives believed were being used to process powdered cocaine into crack cocaine. For example, on October 4, Mr. Hall called Mr. Whittington's cell phone as they both were leaving a house located at 101 Orsburn Drive. Both men expressed concern about a marked patrol car that was in the area. Det. Underhill noted that "[s]urveillance throughout this investigation has confirmed that Hall regularly travels to [101 Orsburn Drive] for short durations of time, consistent with CDS activity."

A few days later, the detectives observed Mr. Hall and Mr. Whittington together again in Mr. Whittington's Stratus after they overheard Mr. Hall making arrangements to sell CDS at the Wendy's in Joppatowne. Detectives conducted surveillance of the parking

5

lot and observed a Hyundai that was registered to the suspected purchaser's daughter. Shortly after detectives identified the Hyundai, Mr. Hall and Mr. Whittington arrived in the Stratus. The Hyundai followed the Stratus from the Wendy's to the area of 952 Rumsey Place, even though "[n]o communication took place between them, which indicates that [the driver of the Hyundai] already recognized that vehicle as being associated to Hall and drug deals." Mr. Hall and Mr. Whittington went inside 952 Rumsey Place, and the Hyundai waited out front. Ten minutes later, the Hyundai drove away, and the prospective purchaser telephoned Mr. Hall to tell him that he could not wait any longer.

In view of the foregoing activity, the detectives believed that GPS monitoring of Mr. Whittington's car would further their investigation. Det. Underhill averred that considering the circumspect behavior he observed, including Mr. Whittington's evasive driving maneuvers, "[y]our affiant has cause for concern if required to announce or give warning in any fashion. The purpose of utilizing an electronic tracking device is to covertly conduct surveillance so as not to jeopardize the integrity of the investigation."

**B. Application for Search and Seizure Warrant**

In the warrant affidavit,[3] the detectives averred that they began to focus their investigation on Mr. Hall and Mr. Whittington after a confidential source ("CS 1")

---

[3] The application for the Search and Seizure Warrant included a probable cause statement involving travel and interactions by and between Mr. Hall and Mr. Whittington. The application requested authority to search not only Mr. Whittington's apartment, car, and person, but also: 1) Mr. Hall's Dodge Durango; 2) Mr. Hall's apartment located at 6032 Amberwood Road in Baltimore; 3) 2514 Hanson Road in Edgewood, a residence where Mr. Hall "ma[de] frequent short trips"; and 4) 101 Orsburn Drive in Joppa—a location police "believ[ed] . . . [wa]s being used . . . to further the drug organization of Hall and Whittington."

identified a potential drug dealer as a man with the street name "Heavy." CS 1 provided information about what vehicles "Heavy" used and the locations where he often sold and stored drugs. Data obtained from the wiretap and "other investigative techniques" helped police positively identify "Heavy" as David Hall. A criminal history check revealed that Mr. Hall had 37 charges on his record (20 of which involved CDS) spanning the years 1988 to 2006.

Throughout summer and fall of 2016, the Narcotics Task Force Members continued to surveil Mr. Hall and witnessed activity that was, in their view, consistent with ongoing drug transactions. On July 5, 2016, law enforcement observed Mr. Hall leaving his residence at 6032 Amberwood Road. He drove to a Marshalls store and went inside where he remained for approximately 20 minutes; then he came out and got into a gray Dodge Stratus. Police checked MVA records and found the car listed to Kevin Whittington. A criminal history check then revealed that Mr. Whittington was charged and convicted of "CDS: Possession with Intent to Distribute- Narcotic" in 2005. Mr. Whittington was also arrested and charged in 2015 with possession of over 3 ounces of cocaine and $1,214 in currency.

As mentioned in the application for the GPS Order, detectives continued to surveil Mr. Hall and Mr. Whittington throughout the afternoon of July 5 and observed them taking unusual routes to reach destinations and making lots of loops and u-turns so that they could not be followed. The two men drove to a neighborhood in Middle River and remained there for 15 minutes. Then they drove to the White Marsh area off I-695, but the detectives had to terminate surveillance "due to Whittington's driving habits." The detectives swore

7

in their warrant affidavit that they believed that the totality of these circumstances indicated that Mr. Hall and Mr. Whittington were engaged in CDS activity.

GPS surveillance disclosed Mr. Whittington's Stratus arriving at 101 Orsburn Dr. in Joppa around 3:45 p.m. on October 11. It remained stationary at this address for nine minutes, then left. Police had received information previously from a confidential informant that Mr. Hall maintained a stash-house in that general area. Police were able to corroborate Mr. Hall's association with this address through visual surveillance. At 4:01 p.m., the Stratus parked at a small shopping center located at 11450 Pulaski Highway, where it remained stationary for 15 minutes, then departed. At 4:25 p.m., the vehicle returned to the Orsburn Dr. address. The vehicle remained there until 6:12 p.m. and then returned to 4 Cloverwood Ct. where it remained for the rest of the night.

On October 12, at 4:45 p.m., the Stratus traveled from 4 Cloverwood Ct. back to the Orsburn Dr. address and remained there until 6:39 p.m. The next day, Mr. Whittington's vehicle left the Cloverwood Ct. address and traveled to various locations throughout Harford County, staying at each location for only several minutes before departing. The vehicle returned to Orsburn Dr., remained there for about 20 minutes, and then returned to 4 Cloverwood Ct. for the rest of the day.

The pattern repeated on October 14. At 5:58 p.m., the Stratus traveled to 101 Orsburn Dr. and remained there for two hours. Then, throughout the rest of the evening, the vehicle traveled to various locations and parking lots in the region. One location was in the 5300 block of King Arthur Circle, where the vehicle remained for 14 minutes, before returning to 4 Cloverwood Ct at the end of the day.

On October 17, Task Force units conducted visual surveillance on Mr. Whittington while he drove the Dodge Stratus. He was first observed at a Wendy's on Route 924 near Singer Road in Abingdon. From there, officers followed him directly to another Wendy's in the Joppatowne Shopping Center. He remained inside for less than three minutes, then exited with an unidentified male. Neither man carried any items from the restaurant. At 4:05 p.m., Mr. Whittington drove to the Orsburn Dr. address, where police confirmed Mr. Hall was as well. Mr. Whittington remained there for about an hour and twenty minutes. Police also observed that Mr. Whittington took unusual routes of travel on his way home to 4 Cloverwood Ct. for the evening.

The investigation revealed that Apartment 202 located at 4 Cloverwood Ct. was leased by Bernard and Denotta Teagle, who lived at 3106 Laurel View Dr., Abingdon, Maryland. Mr. Whittington's car was also registered to the Laurel View Dr. address. Police pieced this information together with their observations recited above and deduced that Mr. Whittington's actual place of residence was 4 Cloverwood Ct., Apt. 202.

Hot on the trail, on October 24, Detectives Underhill and Vivino presented a 16-page "Application and Affidavit for Search and Seizure Warrant" in the District Court sitting in Harford County. They averred that they had "probable cause to believe that laws relating to the illegal Manufacturing, Distribution, Possession and Possession with Intent to Distribute Controlled Dangerous Substances" were being violated "in and upon certain vehicles and premises[.]" The application covered several addresses, including 4 Cloverwood Ct. and 101 Orsburn Drive. Regarding 4 Cloverwood Ct. and the Stratus, the detectives avowed:

9

> For the reasons explained . . . your affiants believe that based on Whittington's behavior, travel patterns and habits, he is using 4 Cloverwood Court Apt 202, as a location to store cocaine. He is also using his 2002 Dodge Stratus . . . to facilitate his own drug distribution operations.

The warrant was issued by a judge on the same day. The search of the Stratus revealed four baggies of cocaine totaling about eight grams. The search of 4 Cloverwood Ct., Apt. 202, revealed paperwork addressed to "The Whittington Family"; two bags of cocaine weighing approximately 145.9 grams, one of which had many smaller baggies within it; $1,222; and ten Alprazolam pills. The police stopped Mr. Whittington at 7755 Bradshaw Road in Baltimore County, and found $1,406 and two cellular telephones on his person. He was arrested and taken into custody.

### C. Motion to Suppress

At the hearing on Mr. Whittington's motion to suppress in the Circuit Court for Baltimore County on September 18, 2018, Mr. Whittington's counsel asked the court to suppress all evidence against Mr. Whittington obtained under the search warrant. He presented three arguments in support of the motion.

First, counsel argued that "there was no substantial basis" for finding probable cause to search 4 Cloverwood Ct., Apt. 202, because the apartment was located miles away from Mr. Whittington's alleged drug activities and the police failed to establish a nexus between his alleged drug dealings and 4 Cloverwood Ct. He asserted that under *Agurs v. State*, 415 Md. 62 (2010), and *Holmes v. State*, 368 Md. 506 (2002), in the absence of direct evidence, Maryland requires that some nexus be established between the nature of the items sought and the place where they are to be seized. Comparing the facts in his case to *Agurs*, Mr.

10

Whittington's counsel contended that police observed Agurs engaging in a drug transaction and that there was a greater nexus showing because the police had conclusive evidence that Agurs owned and lived in the home that was searched. By contrast, counsel argued, the police had no conclusive evidence that Mr. Whittington engaged in a drug transaction or that he owned the 4 Cloverwood Ct. apartment or that he even lived there.

The second argument advanced by Mr. Whittington's counsel concerned the GPS monitor. He argued that a warrant was required to place the device on his client's car and that a court order would not suffice under the Supreme Court's holding in *United States v. Jones*, 565 U.S. 400 (2012). He further asserted that Maryland's statute permitting law enforcement's use of such a device pursuant to a court order is unconstitutional. Counsel urged that even if a warrant was not required, the application for the GPS Order did not establish probable cause that Mr. Whittington was using the Dodge Stratus to commit drug crimes.

Third, counsel argued that police cannot act in good faith reliance on a court order—only on a warrant—so the good faith exception should not apply to the evidence obtained by the police from the GPS tracking device permitted under the order. In regard to the warrant that was issued, counsel asserted that Mr. Whittington's case was analogous to *Agurs*, and that the holding—that the police could not have relied in good faith on the warrant because it lacked any indicia of probable cause—applied with equal force to the detectives who obtained the warrant to search Mr. Whittington's apartment, car and person. *See* 415 Md. at 83.

11

Mr. Whittington's counsel noted that "all of the observations [in the warrant application] that allege to establish any kind of nexus is just GPS monitoring of the vehicle going from place to place." He concluded by asserting that, "if the GPS was illegally placed, not only does the search of the vehicle fall, it also taints the search of the home, before you even get to the nexus issue[.]"

The State maintained that the GPS device was lawfully placed on the car and that the subsequent warrant was reviewed by a detached and neutral judge and lawfully issued. Quoting extensively from CP § 1-203.1, the State pointed out that the statute requires, among other things, "an affidavit that sets forth the basis for probable cause and contains facts within the personal knowledge of the affiant" and provides that the "order issued under this section must name or describe with reasonable particularity the type of electronic device associated with the location information sought." The statute also requires, the State advised, that the court believe "[t]hat a misdemeanor or felony has been committed or is about to be committed by the owner [] or user of the electronic device, or about whom the information—location information being sought."

Responding to Mr. Whittington's reliance on *Agurs*, the State highlighted that a majority of the Court of Appeals did not join in part B of the Court's decision (holding that the good faith exception to the exclusionary rule did not apply). Consequently, the State urged that that holding is not binding on any court. The State argued that the detectives could have relied on the warrant in good faith, especially when viewed in light of the totality of the entire investigation described in the affidavit—not just the parts dealing with Mr. Whittington. The State also noted that it was reasonable for the detectives to believe

12

that Mr. Whittington lived at the 4 Cloverwood Ct. address because they determined through surveillance that the Dodge Stratus registered to Mr. Whittington returned to that address at the end of every night.

During the State's argument, the circuit court judge interjected several questions and observations, beginning with the statement, "[t]here's no description of any drug activity, other than suspicions, but there's no sells." The judge did not find the facts relating to 4 Cloverwood Ct. "terribly relevant, other than that [Mr. Whittington] -- he goes to the house and he sleeps there."

The judge delivered an oral ruling, announcing first that the warrant-issuing judge did not have a substantial basis to find probable cause to issue the search warrant. The judge explained that the warrant affidavit stated that short stays in many places were consistent with CDS activity, but the affidavit also described extended stays at the Orsburn Dr. address that were inconsistent with this theory. The judge also referred to his own comments during the State's argument, including that there were no drug sells documented and no allegations regarding the house except that Mr. Whittington went there to sleep.

Turning, however, to the good faith exception to the exclusionary rule, the judge found that the detectives relied on the warrant in good faith. The judge expounded, "there's nothing so obvious in [the warrant] that an officer would not deem it to be reasonable based on the issuance of it by a neutral magistrate, or in this particular case District Court judge."

The judge also ruled that the court order issued pursuant to CP § 1-203.1 was proper because it was expressly authorized by the statute and "does set forth the probable cause and gives sufficient basis for the issuance of that order." Leaving the question of the impact

13

of the Supreme Court's decision in *Jones* for appellate courts to review, the court reiterated that "the officers had authority to request it and the judge had authority to issue it. And I do find that there was probable cause for the judge to have issued [the order]." Accordingly, the judge denied the motion to suppress evidence obtained under the warrant.

## DISCUSSION

## I.

## Standard of Review

Matters of statutory interpretation are questions of law that this Court reviews de novo. *Johnson v. State*, 467 Md. 362, 371 (2020). Our only deference is to the policy decisions of the General Assembly. *Phillips v. State*, 451 Md. 180, 196 (2017). "We assume that the legislature's intent is expressed in the statutory language and thus our statutory interpretation focuses primarily on the language of the statute to determine the purpose and intent of the General Assembly." *Id.* As we examine the plain language, we also view it "within the context of the statutory scheme to which it belongs, considering the purpose, aim or policy of the Legislature in enacting the statute." *Johnson*, 467 Md. at 372 (citation and internal quotations omitted).

When called upon to review the denial of a motion to suppress, we base our decision solely on the record of the suppression hearing. *Kelly v. State*, 436 Md. 406, 420 (2013). "In reviewing a trial court's decision to grant or deny a motion to suppress evidence based on a constitutional violation, we generally accept any fact findings made by the trial court unless they are clearly erroneous. The ultimate question as to whether there was a constitutional violation is a legal question on which we accord no special deference to the

14

trial court." *State v. Copes*, 454 Md. 581, 603 (2017). Similarly, whether the exclusionary rule, or one of its exceptions, should apply in a given case is also a question of law that we consider without deference to the suppression court. *Id.*

## II.

### "Warrantless" Surveillance by Law Enforcement?

### A. Contentions on Appeal

Mr. Whittington argues that it was error to deny his motion to suppress all evidence obtained from the "warrantless" use by police of a GPS device to track his movements during the fall of 2016. He contends that CP § 1-203.1 is unconstitutional on its face because it allows law enforcement to conduct searches pursuant to a court order rather than a warrant as required by the Fourth Amendment. The Supreme Court in *United States v. Jones*, 565 U.S. 400 (2012) addressed this precise issue and, he maintains, clarified that a warrant is required to place a GPS tracking device on a suspect's vehicle.

The State asserts that the suppression court properly determined that the court order for the GPS tracking device was lawfully issued and the evidence therefrom lawfully obtained. The State's principal contention is that the court order authorized by CP § 1-203.1 is the functional equivalent of a warrant. Besides, the State contends, Mr. Whittington does not identify any meaningful differences between an "order" and a "warrant" other than the names assigned to them. Quoting from *State v. Copes*, the State urges that the "constitutional requirements are addressed to substance, not form." *See* 454 Md. at 625. Mr. Whittington replies that the *Copes* case is distinguishable because it

15

concerned the suppression of evidence obtained by police from the use of a cell site simulator, rather than a GPS tracking device.

## B. Analogue or Archetype?

Maryland appellate courts have not opined on the constitutionality of CP § 1-203.1. *See Copes*, 454 Md. at 592. The statute was mentioned in *Copes*, but only to mark its passage in 2014, just after the police in that case obtained a court order under the Maryland Pen Register Statute, codified at Courts & Judicial Proceedings Article ("CJP"), § 10–4B–01 *et seq.*[4] *Id.* In *State v. Andrews*, we similarly declined to decide the question as it was not squarely presented for our review. 227 Md. App. 350, 407-08 (2016). We did, however, note that the statute contains safeguards and limitations that were absent from Maryland's pen register statute. *Id.* Now the question—whether an order issued under the requisites of CP § 1-203.1 satisfies the requirements of the Fourth Amendment and the Supreme Court's holding in *Jones*—is before us.

At the threshold, we narrow the scope of our analysis; first, by discarding Mr. Whittington's contention that CP § 1-203.1 is unconstitutional on its face. "A facial challenge to a legislative Act is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Mr. Whittington failed to

---

[4] The Court observed in *Copes* that "[u]nlike an application for a search warrant, the application to use a pen register or trap and trace device need not demonstrate probable cause that a crime has been committed or that the evidence relating to that crime will be acquired through use of the device." *Copes*, 454 Md. at 591-92.

16

mount a facial challenge to CP § 1-203.1 because he did not demonstrate that there is "no set of circumstances" under which the statute would be valid.[5] Moreover, under the "canon of constitutional avoidance," our review is guided by the "principle that statutes carry a strong presumption of constitutionality" and that "'one attacking [the] validity [of a law passed in the exercise of police power] has the burden of affirmatively and clearly establishing its invalidity[.]'''  *Koshko v. Haining*, 398 Md. 404, 426 (2007) (citations omitted).

Next, we reject any categorical proposition that an "order" issued by a neutral magistrate cannot serve as the functional equivalent of a "warrant" issued by a neutral magistrate.[6] We recognize that formal labels are necessary to organize the ontology of the law, but, in this case, as in most, the label is not dispositive.  Judge McDonald writing for the majority in *Copes* noted that, when an application for a pen register order meets certain criteria, namely, that "in addition to being sworn, the application for the order demonstrates

---

[5] Mr. Whittington posits only that law enforcement's use of GPS tracking, under the statute, is unconstitutional and does not address, for example, the other types of location tracking that are covered by the statute.  Without mounting a challenge to law enforcement's use of all technology authorized under the requirements of the statute and all of the circumstances in which such tracking technology may be employed, Mr. Whittington cannot attack CP § 1-203.1 on its face. *See Pizza di Joey, LLC v. Mayor & City Council of Balt.*, 241 Md. App. 139, 198 (2019), *cert. granted,* 466 Md. 192 (2019).

[6] Mr. Whittington presumes that there are the substantive differences between a warrant and the order that was obtained in this case but has not specified any such distinctions before the suppression court or this Court on appeal.  Mr. Whittington also presents no argument on appeal in support of his bald allegation before the suppression court that the order was not issued upon probable cause.

17

probable cause, and the order satisfies the particularity requirement of the Fourth Amendment[,]" then "it does not matter whether the order is labeled a 'warrant.' The constitutional requirements are addressed to substance, not form." *Copes*, 454 Md. at 625. Supreme Court precedent also suggests that a court order that meets all of the Fourth Amendment requirements can function as a valid search warrant. *See Dalia v. U.S.*, 441 U.S. 238, 256 (1979) ("[T]he April 5 court order authorizing the interception of electronic communications occurring within petitioner's office was a warrant issued in full compliance with these traditional Fourth Amendment requirements.").

Also, we can dispense with a lengthy exposition on the Fourth Amendment implications of law enforcement installing GPS tracking technology on a suspect's vehicle. *Jones*, 565 U.S. at 404; *Kelly v. State*, 436 Md. 406, 411 (2013). In *United States v. Jones*, the Supreme Court held that a GPS device affixed by law enforcement on a suspect's vehicle to monitor his movements constituted a search under the Fourth Amendment,[7] and

---

[7] Justice Scalia's majority opinion employed the traditional, pre-*Katz* (*Katz v. United States*, 389 U.S. 347 (1967)) "trespass" rationale, although the majority noted that cases not involving physical trespass, such as the transmission of electronic signals, would remain subject to the *Katz* reasonable-expectation-of-privacy test. *Jones* 565 U.S. at 411. Justices Sotomayor and Alito, in their concurring opinions, expressed overarching concerns about the impact of contemporary surveillance technologies on Fourth Amendment jurisprudence. *See id.* at 413 (Sotomayor, J., concurring); 418 (Alito, J., concurring in the judgment). Justice Sotomayor urged the Court to update its understanding of peoples' expectations of privacy in the information age:

> Awareness that the Government may be watching chills associational and expressive freedoms. And the Government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse. The net result is that GPS monitoring—by making available at a relatively low cost such a substantial quantum of intimate information about any person

affirmed the D.C. Circuit Court's decision that the warrantless use of the GPS device was

unconstitutional. 565 U.S. at 404. Indeed, the State concedes that the placement of the

GPS device on Mr. Whittington's car by police triggered Fourth Amendment protections.

Although the Supreme Court in *Jones* did not specifically address whether police must

obtain a warrant before installing a GPS tracking device on a suspect's vehicle,[8] we accept

---

whom the Government, in its unfettered discretion, chooses to track—may "alter the relationship between citizen and government in a way that is inimical to democratic society." *United States v. Cuevas–Perez*, 640 F.3d 272, 285 (C.A.7 2011) (Flaum, J., concurring).

*Jones*, 565 U.S. at 415-16 (Sotomayor, J., concurring) (footnote omitted). Numerous articles examining the limitations of both the property-based trespass rationale as well as the *Katz* reasonable-expectation-of-privacy test offer recommendations for warrant requirements in this modern age of surveillance. *See*, *e.g.*, Rachel Levinson-Waldman, *Hiding in Plain Sight: A Fourth Amendment Framework for Analyzing Government Surveillance in Public*, 66 Emory L.J. 527 (2017); David Gray & Danielle Citron, *The Right to Quantitative Privacy*, 98 Minn. L. Rev. 62, 111 (2013). In his book, THE FOURTH AMENDMENT in an AGE OF SURVEILLANCE, Cambridge University Press (2017), 104-129, Professor David Gray discusses various "post-*Jones* proposals for rethinking the Fourth Amendment." Professor Gray forewarns that:

Today, law enforcement officers and other government agents have access to a wide variety of new and emerging technologies that allow them to conduct searches and seizures without physically intruding upon our persons, houses, papers, or effects. These technologies mark the advent of our age of surveillance.

*Id*. at 23.

[8] *See Carpenter v. United States*, ___ U.S. ____, 138 S. Ct. 2206, 2215 n.2 (2018) ("[N]either *Jones* nor *Knotts* purported to resolve the question of what authorization may be required to conduct such electronic surveillance techniques."); *United States v. Sparks*, 711 F.3d 58, 62 (1st Cir. 2013) (noting that one question that remained open after *Jones* was whether placement of a GPS device "requires a warrant (instead of mere probable cause or reasonable suspicion)"); *Pennsylvania v. Burgos*, 64 A.3d 641, 650 (Pa. Super.

that the "Fourth Amendment's prohibition against unreasonable searches is generally satisfied when law enforcement officers obtain a warrant authorizing the search in question." *Copes*, 454 Md. at 618 (citing *Riley v. California* 573 U.S. 373, 382 (2014)).

We proceed, therefore, to determine whether an order issued to law enforcement under CP § 1-203.1 for the purpose of installing GPS tracking technology on a suspect's vehicle meets the warrant requirements of the Fourth Amendment. The State contends that it does, and we agree.

At the finish, we resolve that the statute, among other things, demands that an application for an order be made under oath by an affiant who, based on personal knowledge of the facts, sets forth the probable cause for believing that a crime is being committed or is about to be committed, and then identifies "the individual about whom location information is being sought." CP § 1-203.1 (b). We also observe that the statute,

---

Ct. 2013) ("[T]he *Jones* Court did not address whether the government must obtain a warrant to install and use a GPS tracking device, and if not, what level of suspicion is required, reasonable suspicion or probable cause."); *see also* Jason D. Medinger, *Post-Jones: How District Courts are Answering the Myriad Questions Raised by the Supreme Court's Decision in United States v. Jones*, 42 U. Balt. L. Rev. 395, 397 (2013). Some federal appellate courts have, nevertheless, held that a warrant supported by probable cause is required for placement of a GPS tracking device on a suspect's vehicle. *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016) ("Placement of a GPS tracking device on a vehicle is a 'search' within the meaning of the Fourth Amendment, requiring probable cause and a warrant."). The Sixth Circuit has further confirmed that probable cause is a prerequisite to the issuance of a valid location tracking warrant under FRCRP 41. *United States v. Coleman*, 923 F.3d 450, 454 (6th Cir. 2019) ("According to Federal Rule of Criminal Procedure 41(c)–(d), a magistrate judge must issue a tracking-device warrant if a supporting affidavit establishes probable cause to believe that the device will uncover evidence, fruits, or instrumentalities of a crime.").

20

tailored to address modern tracking technology,[9] imposes time limitations and requires concise identification of the technology that law enforcement plans to employ in collecting location data—requisites that further aid in protecting citizens from indiscriminate government surveillance.  We begin our analysis by outlining some basic principles of Fourth Amendment law and the requirements of a valid warrant.

## C.  Warrant Requirements

The Fourth Amendment to the United States Constitution provides, in relevant part, that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.[10]  Subject to certain exceptions, searches and seizures conducted

---

[9] Surveillance technology may be effectively embedded in everything from phones to clothes and credit cards or appended to cars and drones.  *See*, Rachel Levinson-Waldman, *Hiding in Plain Sight: A Fourth Amendment Framework for Analyzing Government Surveillance in Public*, 66 Emory L.J. at 542; David Gray, THE FOURTH AMENDMENT in an AGE OF SURVEILLANCE, Cambridge University Press (2017), 27 ("Another tracking technology that is rapidly expanding governmental surveillance capacities is Radio Frequency Identification (RFID). . . . RFID tags come in a variety of shapes and sizes ranging from key fobs to tiny chips to cylinders the size of rice grains.").

[10] The parties do not present their arguments under Article 26 of the Maryland Constitution, Declaration of Rights, which states:

> That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

Md. Const. Decl. of Rights, art. 26.  Despite the textual differences, Maryland courts have generally construed Article 26 as extending protections that are co-extensive with those protections afforded under the Fourth Amendment of the United States Constitution.  *See,*

without a warrant are presumed unreasonable. *Grant v. State*, 449 Md. 1, 17 (2016) (citing *Katz v. United States*, 389 U.S. 347, 356–57 (1967)). In warrantless-search and-seizure cases, the State bears the burden of overcoming the presumption that a warrant was required. *Eusebio v. State*, 245 Md. App. 1, 22 (2020) (citation omitted). In the instant case, the State had the burden of establishing that the order issued pursuant to CP § 1-203.1 met the requirements of a warrant.

A valid search warrant requires a law enforcement officer to present a "neutral and detached magistrate" with sworn testimony that demonstrates probable cause. *Copes*, 454 Md. at 618 (citing *Illinois v. Gates*, 462 U.S. 213, 238-40 (1983)). It is long established that the "touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). And reasonableness, in turn, is measured objectively by examining the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

---

*e.g.*, *King v. State*, 434 Md. 472, 483 (2013) (noting that "[a]lthough we have asserted that Article 26 may have a meaning independent of the Fourth Amendment, we have not held, to date, that it provides greater protection against state searches than its federal kin"); *Parker v. State*, 402 Md. 372, 386, 396, 400–01 (2007); *Byndloss v. State*, 391 Md. 462, 465 n.1 (2006); *Fitzgerald v. State*, 384 Md. 484, 506 (2004); *Upshur v. State*, 208 Md. App. 383, 397 (2012); *see also* Dan Friedman, THE MARYLAND STATE CONSTITUTION: A REFERENCE GUIDE 62–63 (Oxford ed. 2011) (and cases cited therein). It is important to point out that the requirement of a warrant is derived from the Fourth Amendment's command that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" *See Agnello v. United States*, 269 U.S. 20, 32 (1925) ("The search of a private dwelling without a warrant is, in itself, unreasonable and abhorrent to our laws."); *see also California v. Acevedo*, 500 U.S. 565, 582 (1991) (Scalia, J. concurring) ("Although the Fourth Amendment does not explicitly impose the requirement of a warrant, it is of course textually possible to consider that implicit within the requirement of reasonableness.").

Correspondingly, probable cause is "'a fluid concept,' 'incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances[.]'" *Stevenson v. State*, 455 Md. 709, 723 (2017) (quoting *Gates*, 462 U.S. at 232; *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). Probable cause is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Patterson v. State*, 401 Md. 76, 91 (2007) (citation omitted). It involves "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Pacheco v. State*, 465 Md. 311, 324 (2019) (citation omitted).

More challenging in the context of modern technology, is the Fourth Amendment's particularity requirement.[11] The Supreme Court has explained that under a properly

---

[11] The GPS technology employed in the underlying order did not require much description because GPS technology is "pervasive and generally reliable." *Johnson v. State*, 457 Md. 513, 530 (2018); *Gross v. State*, 229 Md. App. 24, 35-36 (2016) (holding that witnesses testifying as to facts within their knowledge for the admission of records of GPS data from units installed on company's box trucks did not require specialized training, knowledge, or experience). However, GPS devices are not the apotheosis of surveillance technology, and more sophisticated surveillance, such as Cell Site Location Information ("CSLI") technology, may require more description and reporting. In *State v. Andrews*, the police sought court authority to use a cell site simulator under the Maryland Pen Register Act but failed to disclose in their application for a pen register order that they intended to use a cell site simulator. 227 Md. App. 350, 356-57 (2016). The pen register statutes were intended to address devices "that record[] and decode[] dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted" or "capture[] the incoming electronic impulses . . . that identify the originating number or other [information] reasonably likely to identify the source of a wire or electronic communication." *Id.* at 402 (citing CJP § 10-4B-0.1). Consequently, "most judges [who] sign[ed] these orders [thought] they [were] allowing traditional pen trap operations aided by telephone companies, not licensing the use of a cell site simulator because many officers [did] not disclose the true nature of their activities in

23

particular warrant, "[a]s to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196 (1927). Later, in an opinion striking down a New York statute under the particularity requirement of the Fourth Amendment, Justice Thomas Clark observed, "[t]he law, though jealous of individual privacy, has not kept pace with these advances in scientific knowledge." *Berger v. State of N.Y.*, 388 U.S. 41, 49 (1967).[12]

The Court in *Berger* considered the constitutionality of a statute that authorized state judges to issue orders permitting law enforcement to intercept conversations by wiretapping and other eavesdropping methods. *Id.* at 43, 54. The Court found that the statute did not meet the particularity requirement because

---

their applications." David Gray, THE FOURTH AMENDMENT in an AGE OF SURVEILLANCE, p. 36, n.52.

[12] Justice Clark described the scientific advancements at that time:

> Sophisticated electronic devices have now been developed (commonly known as "bugs") which are capable of eavesdropping on anyone in most any given situation. They are to be distinguished from "wiretaps" which are confined to the interception of telegraphic and telephonic communications. Miniature in size (⅜ ⅜ ⅛ )—no larger than a postage stamp—these gadgets pick up whispers within a room and broadcast them half a block away to a receiver. It is said that certain types of electronic rays beamed at walls or glass windows are capable of catching voice vibrations as they are bounced off the surfaces. Since 1940 eavesdropping has become a big business. Manufacturing concerns offer complete detection systems which automatically record voices under almost any conditions by remote control. A microphone concealed in a book, a lamp, or other unsuspected place in a room, or made into a fountain pen, tie clasp, lapel button, or cuff link increases the range of these powerful wireless transmitters to a half mile.

*Berger*, 388 U.S. at 46-47.

24

> [i]t merely says that a warrant may issue on reasonable ground to believe that evidence of crime may be obtained by the eavesdrop. It lays down no requirement for particularity in the warrant as to what specific crime has been or is being committed, nor "the place to be searched," or "the persons or things to be seized" as specifically required by the Fourth Amendment. The need for particularity and evidence of reliability in the showing required when judicial authorization of a search is sought is especially great in the case of eavesdropping. By its very nature eavesdropping involves an intrusion on privacy that is broad in scope.

*Berger*, 388 U.S. at 55–56. Furthermore, the Court denounced the statute's failure to carefully circumscribe law enforcement activities to prevent unauthorized invasions of privacy, concluding that the statute "actually permits general searches by electronic devices, the truly offensive character of which was first condemned in *Entick v. Carrington*, 19 How.St.Tr. 1029, and which were then known as 'general warrants.' The use of the latter was a motivating factor behind the Declaration of Independence." *Id.* at 58. Justice Clark also reproved the authorization of eavesdropping for a two-month period, with the possibility of additional two-month extensions, as "insufficient without a showing of present probable cause for the continuance of the eavesdrop." *Id.* at 59.

In our effort to stay apace with scientific advances, we have recognized that in order to particularly describe the place to be searched, and the persons or things to be seized, the application for a warrant or order must identify, among other things, what type of tracking device law enforcement intends to use. *See Andrews*, 227 Md. App. at 376 ("The analytical framework [of the reasonableness of a search or seizure] requires analysis of the functionality of the surveillance device and the range of information potentially revealed by its use."). Accordingly, we held in *State v. Andrews* that

25

unless a valid exception to the warrant requirement applies, the government may not use a cell phone simulator without a warrant or, alternatively, a specialized order that requires a particularized showing of probable cause, **based on sufficient information about the technology involved to allow a court to contour reasonable limitations on the scope and manner of the search**, and that provides adequate protections in case any third-party cell phone information might be unintentionally intercepted.

227 Md. App. at 413 (emphasis added) (footnote omitted). [13]

## D. CP § 1-203.1

The purpose of statutory interpretation "is to ascertain and effectuate the real and actual intent of the Legislature.  A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny." *State v. Bey*, 452 Md. 255, 265 (2017).  "Under what the United States Supreme Court termed 'the canon of constitutional avoidance,' we will construe a statute to avoid conflict with the Constitution whenever it is reasonably possible to do so, even to the extent of applying a judicial gloss to interpretation that skirts a constitutional confrontation." *Harrison-Solomon v. State*, 442 Md. 254, 287 (2015).  We

---

[13] As we mentioned earlier in f.n. 1, CP § 1-203.1 was amended during the 2020 legislative session of the Maryland General Assembly.  2020 Md. Laws Ch. 222 (H.B. 499).  The purpose of the amendments was to explicitly "appl[y] current law provisions relating to an application for an order to obtain location information by law enforcement and the duration of such an order to the use of cell site simulator technology by law enforcement."  Fiscal Note, H.B. 499, 2020 Leg., 441st Sess. (Md. 2020).  Accordingly, the term "Cell Site Simulator" was added to the statute.  Furthermore, to specifically protect citizens from  the indiscriminate use of CSLI technology, the General Assembly added the requirements that: "any third-party or nontarget data be permanently destroyed on the expiration of the order," CP § 1-203.1(b)(4)(iv); "no content data be obtained," CP § 1-203.1(b)(4)(v); and the order shall "restrict the investigative use of any third-party or nontarget data without further court order." CP § 1-203.1(b)(4)(vi).

will not presume that the General Assembly intended to enact unconstitutional legislation. *Id.*

To determine legislative intent, we turn first to the plain meaning of the statute. *Berry v. State*, 244 Md. App. 234, 244 (2019). "Even if the plain meaning is clear and unambiguous, we often look to legislative intent and purpose to determine if they ratify our analysis and interpretation of a statute." *Hammonds v. State*, 436 Md. 22, 44 (2013).

### *Plain Language*

We begin our analysis by examining the plain language of CP § 1-203.1. The statute was enacted in 2014, amended without substantive change in 2018 and 2019, and then amended again this year to include additional protections for orders authorizing the use of CSLI technology. Because the court order in the underlying case was issued on October 8, 2016, the statute as enacted in 2014 is the relevant version.

The plain language of CP § 1-203.1 shows that the statute embodies all of the warrant requirements inhering in the Fourth Amendment. Subsection b provides,[14] in

---

[14] The language that we examine remains in the current statute because, as we have explained, *supra,* f.n. 13, CP § 1-203.1 was substantively amended in 2020 principally to *add* language concerning the use of CSLI, which is not the subject of this appeal. In 2016, subsection (b) of CP § 1-203.1 provided as follows:

(b)(1) A court may issue an order authorizing or directing a law enforcement officer to obtain location information from an electronic device after determining from an application described in paragraph (2) of this subsection that there is probable cause to believe that:

(i) a misdemeanor or felony has been, is being, or will be committed by the owner or user of the electronic device or by the individual about whom location information is being sought; and

(ii) the location information being sought:

    1. is evidence of, or will lead to evidence of, the misdemeanor or felony being investigated; or

    2. will lead to the apprehension of an individual for whom an arrest warrant has been previously issued.

(2) An application for an order under this section shall be:

    (i) in writing;

    (ii) signed and sworn to by the applicant; and

    (iii) accompanied by an affidavit that:

        1. sets forth the basis for probable cause as described in paragraph (1) of this subsection; and

        2. contains facts within the personal knowledge of the affiant.

(3) An order issued under this section shall:

    (i) name or describe with reasonable particularity:

        1. the type of electronic device associated with the location information being sought;

        2. the user of the electronic device, if known, or the identifying number of the electronic device about which location information is sought;

        3. the owner, if known and if the owner is a person or an entity other than the user, of the electronic device;

        4. the grounds for obtaining the location information; and

        5. the name of the applicant on whose application the order was issued;

    (ii) authorize the executing law enforcement officer to obtain the location information without giving notice to the owner or user of the electronic device or to the individual about whom the location information is being sought for the duration of the order;

    (iii) specify the period of time for which location information is authorized to be obtained; and []

pertinent part, that a court may issue an order that allows law enforcement to obtain location information "after determining[,] from an application described in paragraph (2) of this subsection[,]" that "there is probable cause to believe that . . . a misdemeanor or felony has been, is being, or will be committed . . . by the individual about whom location information is being sought[.]" CP § 1-203.1(b)(1)-(1)(i).  Paragraph (2) requires a written application that is "signed and sworn to by the applicant" and is "accompanied by an affidavit that[] . . . sets forth the basis for probable cause . . . and [] contains facts within the personal knowledge of the affiant."  CP § 1-203.1(b)(2).

Importantly, in light of the particularity requirement, the statute further requires that any order issued pursuant to it must "describe with reasonable particularity[] . . . the type of electronic device associated with the location information being sought"; "the user of the electronic device, if known, or the identifying number of the electronic device about which location information is sought"; and "the grounds for obtaining the location information[.]"  CP § 1-203.1(b)(3).

The statute also delineates specific time limitations and notice requirements.  Under CP § 1-203.1(c), unless there is probable cause for an extension, an order may not exceed 30 days and expires automatically if not acted upon within 10 days of issuance of the order.  Within 10 days after expiration of the order, "[n]otice of the order shall be delivered to the user and, if known and if the owner is a person or an entity other than the user, the subscriber of the electronic device[.]"  CP § 1-203.1(d).

---

Md. Code Ann., Crim. Proc. § 1-203.1(b) (2014) (amended 2020).

29

Though the language of the statute is clear and unambiguous, we will still look to the legislative intent and purpose to examine if they ratify our analysis and interpretation of a statute. *Hammonds*, 436 Md. at 44.

### *Legislative History*

A review of the legislative history of this statute confirms our analysis of the plain language. The first Fiscal and Policy Note, attached to the bill, cites directly to *United States v. Jones*, and details the Supreme Court's holding in that case, showing that the legislature was aware of the opinion. Fiscal and Policy Note, S.B. 698, 2014 Leg., 434th Sess. (Md. 2014). It reveals that the stated purpose of the bill, as it was first introduced, was to "prohibit[] an agent of the State or a political subdivision of the State from obtaining 'location information' without a search warrant." *Id.* Notably, the first draft of the proposed legislation included the word "warrant" and it was only replaced by "court order" in subsequent drafts. S.B. 698, 2014 Leg., 434th Sess. (Md. 2014).

### *Other States*

Maryland is not the only state to enact legislation to regulate law enforcement's use of GPS tracking technology. At least 18 other states, [15] as well as the Federal

---

[15] Of the states that have statutes governing surveillance via GPS tracking device, the ones that require that law enforcement officers obtain a "warrant" prior to installation are: Alabama, ALA. CODE § 15-5-50 (2019), Arizona, ARIZ. REV. STAT. ANN. § 13-4293 (2019), California, CAL. PENAL CODE § 1524 (West 2019), Connecticut, CONN. GEN. STAT. ANN. § 54-33a (West 2019), Iowa, IOWA CODE ANN. § 808.1 (West 2019), Kansas, KAN. STAT. ANN. § 22-2502 (West 2019), New Hampshire, N.H. REV. STAT. ANN. § 644-A:2 (2019), Oregon, OR. REV. STAT. ANN. § 133.619 (West 2019), South Dakota, S.D. CODIFIED LAWS § 23A-35-4.3 (2019), and Virginia, VA. CODE ANN. § 19.2-56.2 (West 2019).

Government,[16] have statutes prescribing the process that law enforcement must follow before commencing electronic surveillance of a suspect. Of the states that require law enforcement officers to apply for a "warrant", as opposed to a court order, five of them have statutory provisions that define what a warrant is.[17] Among our sister states that chose

---

Florida, Maryland, Pennsylvania, and South Carolina require that law enforcement officers obtain an "order" prior to installation. FLA. STAT. ANN. § 934.42 (West 2019); MD. CRIM. PROC. § 1-203.1; 18 PA. STAT. AND CONS. STAT. ANN. § 5761 (West 2019); S.C. CODE ANN. § 17-30-140 (2019).

Colorado, Hawaii, and the Federal Government require that law enforcement officials obtain a "warrant or court order" or a "warrant or other order[.]" COLO. REV. STAT. ANN. § 16-3-303.5 (West 2019); HAW. REV. STAT. ANN. § 803-44.7 (West 2019); 18 U.S.C.A. § 3117 (West 2019).

[16] The federal government empowers law enforcement to install and use tracking devices primarily through two avenues. The first is 18 U.S.C. § 3117, which provides:

(a) In general.--If a court is empowered to issue a warrant or other order for the installation of a mobile tracking device, such order may authorize the use of that device within the jurisdiction of the court, and outside that jurisdiction if the device is installed in that jurisdiction.
(b) Definition.--As used in this section, the term "tracking device" means an electronic or mechanical device which permits the tracking of the movement of a person or object.

The second is Federal Rule of Criminal Procedure 41, which sets forth the warrant requirements and contains provisions specific to the issuance of tracking device warrants. It provides, generally, that "[a]fter receiving an affidavit or other information, a magistrate judge . . . must issue the warrant if there is probable cause to search for and seize a person or property or to install and use a tracking device." FRCRP 41(d).

[17] ALA. CODE § 15-5-1 (2019) ("A 'search warrant' is an order"); ARIZ. REV. STAT. ANN. § 13-4291 (2019) ("A '[t]racking device search warrant' means an order"); CAL. PENAL CODE § 1523 (West 2019) ("A search warrant is an order"); IOWA CODE ANN. § 808.1 (West 2019) ("'Search warrant' means an order"); S.D. CODIFIED LAWS § 23A-35-1 (2019) ("A search warrant is a written order").

to use the term "order," none of them have directly considered whether a location tracking statute that contains this linguistic difference offends the Fourth Amendment for that reason alone.

In *Florida v. Sylvestre*, the District Court of Appeal of Florida held that even though its mobile tracking device statute does not expressly contain a probable cause requirement, if an order issued pursuant to it nonetheless is supported by probable cause, that order does not violate the Fourth Amendment. 254 So.3d 986, 989 (Fla. Dist. Ct. App. 2018) ("The content of a court's order—not the label affixed to it—determines whether a warrant satisfies the Fourth Amendment."). Notably, that statute requires that any mobile tracking device order be issued in compliance with "[t]he standards established by the United States Supreme Court for the installation and monitoring of mobile tracking devices[.]" FLA. STAT. ANN. § 934.42 (West 2019). The Supreme Court of South Carolina has also confirmed that South Carolina's statute, which requires an "order" supported by probable cause for GPS tracking, does not offend the requirements of the Fourth Amendment or the Supreme Court's holding in *Jones*. *South Carolina v. Adams*, 763 S.E.2d 341, 347 (2014). Neither party in that case challenged the fact that the document was styled as an "order" rather than a "warrant." *Id.*

Prior to the U.S. Supreme Court's decision in *Jones*, the Supreme Court of Wisconsin confronted the issue of "whether [a] court order authorizing the installation and monitoring of a GPS tracking device on [a suspect's] vehicle constitute[s] a valid warrant[.]" *State v. Sveum*, 787 N.W.2d 317, 321 (Wis. 2010). In that case, Wisconsin did not have a statute providing for this type of surveillance, but the investigating detective

32

applied for circuit court authorization to place a GPS tracking device on the car of a suspected stalker. *Id.* at 322. The detective also filed an affidavit to support her request that explained the basis for probable cause. *Id.* at 322-24. The subsequently issued court order provided for placement of a GPS tracking device on the suspect's car for 60 days. *Id.* at 324. On appeal from the denial of the suspect's motion to suppress, the court held that "the order authorizing the installation and monitoring of a GPS tracking device on [the suspect]'s vehicle was a valid search warrant under the Fourth Amendment." *Id.* at 330. The court reasoned that the order did not offend the Constitution because it was signed by a neutral and detached magistrate, supported by probable cause, and particularly described the "object into which the GPS was to be placed[.]" *Id.* at 330-31.

Similarly, there is support in the case law from other states applying the same reasoning to court orders authorizing other types of Fourth Amendment searches. *Whitlow v. Kentucky*, 575 S.W.3d 663, 669 (Ky. 2019) ("While a search warrant is a type of court order, obviously not all court orders constitute search warrants. Here, the court order relied upon to test [defendant]'s blood was not labeled 'search warrant,' but in substance that is exactly what it was."); *State v. Garcia-Salgado*, 240 P.3d 153, 157 (Wash. 2010) (holding that a court order for a DNA swab "may function as a warrant as long as it meets constitutional requirements").

### E. The Order in this Case

When assessing the validity of a search warrant—or, in this case, the order issued under CP § 1-203.1—our standard of review is highly deferential. *State v. Jenkins*, 178 Md. App. 156, 163 (2008). "We determine first whether the issuing judge had a substantial

basis to conclude that the warrant was supported by probable cause." *Id.* (quoting

*Greenstreet v. State*, 392 Md. 652, 667-68 (2006)). To determine whether the issuing judge

had a substantial basis for concluding the warrant was supported by probable cause,

> [w]e do so not by applying a *de novo* standard of review, but rather a deferential one. The task of the issuing judge is to reach a practical and common-sense decision, given all of the circumstances set forth in the affidavit, as to whether there exists a fair probability that contraband or evidence of a crime will be found in a particular search. The duty of a reviewing court is to ensure that the issuing judge had a substantial basis for . . . conclud[ing] that probable cause existed.

*Greenstreet*, 392 Md. at 667-68 (internal citations and quotations omitted). As this Court

noted in *State v. Jenkins*, our deference is to the warrant-issuing judge and not the

suppression court. 178 Md. App. at 170.

On appeal, as before the suppression court, Mr. Whittington claims that the GPS

Order was unconstitutional because it was issued pursuant to CP § 1-203.1, and therefore,

he asserts, it was not a warrant supported by probable cause. Mr. Whittington does not

otherwise specify how the GPS Order failed to meet the requirements of the Fourth

Amendment.

We have determined CP § 1-203.1 imposes conditions and requisites on officers

who seek to employ GPS tracking devices that meet the warrant requirements of the Fourth

Amendment. We conclude, in turn, that the application in this case met the requirements

of the statute because it established a substantial basis upon which the issuing judge could

find probable cause that a "misdemeanor or felony . . . [wa]s being . . . committed" and

"the location information being sought . . . [wa]s evidence of, or w[ould] lead to evidence

of, the misdemeanor or felony being investigated[.]" CP § 1-203.1(b). Det. Underhill's sworn application for the court order to install the GPS device on Mr. Whittington's car gave a detailed accounting of the task force's surveillance up to that point in time, and was based on Det. Underhill's personal knowledge. With particularity, Det. Underhill identified Mr. Whittington as the owner of a Dodge Stratus, and averred that he believed the vehicle was being used by Mr. Whittington in furtherance of numerous crimes involving CDS. The application included the year, license plate number and vehicle identification number. The information contained in the application that supported a finding of probable cause included: (1) Det. Underhill's training and experience; (2) Mr. Whittington's frequent association with a known drug dealer, Mr. Hall, including that a wiretap revealed Mr. Whittington exchanged the highest volume of calls with Mr. Hall; (3) the use of coded language between Mr. Hall and Mr. Whittington; (4) detectives' observations of Mr. Whittington engaged in a suspected CDS transaction; and (5) references to locations that law enforcement believed were being used to process "powder cocaine into crack cocaine[.]" The application also specifically identified the technology that Det. Underhill intended to use: "an electronic tracking device . . . which w[ould] transmit and receive radio signals for the purpose of tracking the movements of the

35

vehicle." The application specified how the GPS device would be installed,[18] and stated that the application, and any order,[19] would be sealed for a period of 30 days.

*Conclusion*

We hold that a court order issued under CP § 1-203.1 is constitutionally-sufficient authorization for GPS location information tracking by law enforcement. We reach this conclusion based on the plain language of the statute, as well as the clear intent of the Maryland General Assembly to craft a statute specifically tailored to surveillance technology, that imposes protections and requirements equivalent to that of a warrant. The statute requires that an order be signed by a neutral and detached magistrate, based on probable cause, and supported by oath or affirmation. It must also identify with reasonable particularity the technology to be employed and the person about whom location information is being sought. Orders are limited, unless certain exceptions apply, to 30 days, after which notice of the order must be delivered to the subject of the order. We also observe that CP § 1-203.1 imposes requirements beyond those required to pass constitutional muster. Clearly the General Assembly has taken the lead in identifying technology that threatens the collective right of the people to be secure against

---

[18] "Enter private property and the aforementioned vehicle without knocking or giving warning for the limited purposes of installing, maintaining, repairing, replacing or removing the electronic tracking device. Seize, if need necessitates, and move the aforementioned vehicle to a secure location for the installation/maintenance of the electronic tracking device."

[19] The application was signed by the District Court Judge as "Sworn to before me and subscribed to in my presence, this 8th day of October, 2016." The Judge also issued a separate order on the same date, including the exact specifications and limitations contained in the application.

unreasonable searches and has manifested its intention that law enforcement obtain an order pursuant to CP § 1-203.1 before using an electronic device to collect location information. We conclude by holding that the court-authorized GPS Order allowing the Harford County Police Department to collect location information by affixing a GPS tracking device to Mr. Whittington's vehicle satisfied the warrant requirements of the Fourth Amendment.

## III.

## Sufficiency of the Search Warrant

### A. Parties' Contentions

Before this Court, Mr. Whittington argues that while the suppression court properly determined that there was no substantial basis to find probable cause to issue the underlying warrant, the court erred in applying the good faith exception to the exclusionary rule "because the lack of probable cause is so apparent on the face of the affidavit, the officers could not have relied on the warrant in good faith." He contends that the warrant was "based on an affidavit that was so lacking in probable cause as to render official belief in its existence entirely unreasonable." He claims the factual allegations in the affidavit are "inconclusive and speculative[,]" and fail to establish a nexus between any suspicious activity and the 4 Cloverwood Ct. apartment. Mr. Whittington points to the fact that the police never observed him with any drugs or exhibiting any behavior "that could not easily be interpreted as innocent." Furthermore, he argues that the police are required to be aware of the nexus requirement between the items sought and the place to be searched. He

contends that the police never actually observed Mr. Whittington enter or exit the 4 Cloverwood Ct. address yet claimed that they believed he was storing drugs there.

To the contrary, the State asserts, first, that the suppression court erred in determining that the warrant-issuing judge lacked a substantial basis to find probable cause. The State contends the warrant was supported by the sworn attestations of a detective with first-hand knowledge of the investigation, relating Mr. Whittington's repeated association with Mr. Hall, a known drug dealer with an extensive criminal record. The State highlights Mr. Whittington's own criminal record and asserts that the activities observed through GPS surveillance of Mr. Whittington's car, such as the short stops at various locations and unusual routes of travel, are consistent with CDS activity. The State points out that the officers relied on their training and experience with illegal drug transactions as set forth in the affidavit they submitted to the warrant-issuing judge. The State concedes in its brief that "there was no direct evidence that conclusively established that [Mr. Whittington] was engaging in drug transactions[,]" but still argues that a nexus may be established upon circumstantial evidence alone, and that Mr. Whittington's activities outside of his home permitted a reasonable inference that evidence of CDS transactions may be stored in his car and his home.

Next, the State contends that even if the warrant judge lacked a substantial basis to issue the warrant, the suppression court properly applied the good faith exception to the exclusionary rule. The State argues that in order for the officer's reliance on the warrant to be deemed unreasonable, the warrant would need to contain entirely conclusory statements and be devoid of facts and circumstances upon which a judge could determine

probable cause. The State points out that the officers provided several pages of facts and observations regarding Mr. Whittington's activities.

We find no error or abuse of discretion in the court's application of the good faith exception to the exclusionary rule. As we explain next, we agree with the court's determination that the detectives in this case relied on the search warrant in good faith. Consequently, we assume, without deciding, that the suppression court correctly determined that the district court judge did not have a substantial basis to find probable cause to issue the warrant.[20] *See Marshall v. State*, 415 Md. 399, 402 (2010) (assuming that the search warrant was issued improperly and analyzing only the application of the good faith exception).

---

[20] Although we are not reviewing whether the warrant-issuing judge had a substantial basis to find probable cause in this case, we note that, were we to do so, we would be confined to the four corners of the warrant and its associated application. *Sweeney v. State*, 242 Md. App. 160, 185 (2019). As Mr. Whittington's counsel pointed out before the suppression court, the application for the GPS Order and the warrant application contained some different points of information. For instance, the wiretap was mentioned in the order application, but not the warrant application. When considering the sufficiency of the warrant, we do not, and the suppression court could not, consider any averments contained solely in the GPS Order application. The court properly examined the application for the GPS Order separately, however, to address counsel's assertion that the order itself was unconstitutional and did not establish probable cause that Mr. Whittington was using the Dodge Stratus to commit drug crimes. Consequently, Mr. Whittington's counsel argued, the averments contained in the warrant application were based on evidence derived from an unconstitutional order and "all of the observations [in the warrant application] that allege to establish any kind of nexus is just GPS monitoring of the vehicle going from place to place."

## B. Good Faith Exception

The United States Supreme Court and the Maryland Court of Appeals "have adopted a good faith exception to the warrant requirement, under which 'evidence seized under a warrant subsequently determined to be invalid may be admissible if the executing officers acted in objective good faith with reasonable reliance on the warrant.'" *Carroll v. State*, 240 Md. App. 629, 654 (2019) (citation omitted). We review the suppression court's determination as to the applicability of the good faith exception without deference when the facts are not in dispute. "In making this determination, we consider all of the circumstances of the case." *State v. Jenkins*, 178 Md. App. 156, 198 (2008) (citation omitted).

To vindicate the Fourth Amendment's guarantee against unreasonable searches and seizures, as well as to deter violations by law enforcement, the Supreme Court has developed the "exclusionary rule." *Copes*, 454 Md. at 605 (citing *Weeks v. United States*, 232 U.S. 383 (1914)). This rule provides that, when evidence is obtained in violation of the Fourth Amendment, such evidence will ordinarily be inadmissible in a state criminal prosecution. *Thornton v. State*, 465 Md. 122, 140 (2019). "The exclusionary rule is not itself an individual right; therefore, suppression of evidence 'is not an automatic consequence of a Fourth Amendment violation.'" *Copes*, 454 Md. at 605 (quoting *Herring v. United States*, 555 U.S. 135, 137 (2009)). "[T]he exclusionary rule is designed to deter police misconduct[.]" *United States v. Leon*, 468 U.S. 897, 916 (1984). The rule does not serve its stated purpose if exclusion, in a given case, would not act to deter unlawful law enforcement behavior. *See id.* at 918. Therefore, it is "not applied when law enforcement

40

officials engage in 'objectively reasonable law enforcement activity,' even if that activity is later found to be a violation of the Fourth Amendment." *Copes*, 454 Md. at 606 (quoting *Leon*, 468 U.S. at 919).

The Court of Appeals has instructed that there are four scenarios in which a court should not apply the good-faith exception to the exclusionary rule to an invalid warrant:

> (1) where the issuing authority is "misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth;" (2) "where the issuing magistrate wholly abandoned his judicial role . . .;" (3) where "no reasonably well-trained officer should rely on the warrant . . . [such as] an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;'" and, (4) where a warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."

*Greenstreet v. State*, 392 Md. 652, 679 (2006) (citations omitted). "Where the defect in the warrant is not readily apparent to a well-trained officer, or, where the warrant is based on 'evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause,' then the good faith exception will apply." *Id.* at 679 (quoting *Leon*, 468 U.S. at 926). The Court of Appeals has also opined that "[t]his is a less demanding showing than the 'substantial basis' threshold required to prove the existence of probable cause in the first place." *Patterson*, 401 Md. at 105 (citation omitted). The good faith exception requires that "officers, exercising professional judgment, could have reasonably believed that the averments of their affidavit related to a present and continuing violation of the law, not remote from the date of their affidavit, and that the evidence sought would likely be found at [the place identified in the affidavit]." *Id.* at 107 (citation omitted). The affidavit must contain more than "wholly conclusory statements, which lack the facts

41

and circumstances from which a magistrate can independently determine probable cause."

*Agurs*, 415 Md. at 79 (citation omitted).

The Court of Appeals has often applied the good faith exception even in cases wherein the Court concluded that there was no substantial basis for probable cause. *See Patterson v. State*, 401 Md. 76, 82 (2007). For example, in *Patterson*, the Court of Appeals concluded that the officer had an objectively reasonable belief that there was probable cause to search Garfield Patterson's temporary residence, a motel room, for weapons because a recovered gun holster and matching magazine near the area of his arrest supplied some indicia of probable cause. *Id.* at 107-08. The Court noted that the officer's affidavit detailed Patterson's criminal history as well as the observations of police officers, as opposed to unnamed informants or other unreliable sources. *Id.* at 108-09. Based on the facts set forth in the affidavit, the Court determined that it could not "say as a matter of law that [the officer] should have second-guessed the issuing judge's determination that probable cause existed." *Id.* at 109.

In *Holmes v. State*, the Court of Appeals addressed the nexus requirement specifically, and determined that there was a sufficient nexus between the home and the observed drug activity in that case to justify issuance of a search warrant. 368 Md. 506, 523 (2002). The Court observed that the drug transaction that was the basis for the probable cause "occurred less than a block from petitioner's home. Petitioner[] had a history of [CDS] violations, was in and out of his house immediately prior to meeting his customer, was in confederation with [] another known drug violator . . . and was found with a quantity of marijuana and money on him[.]" *Id.* The Court reasoned that the proximity of the

42

suspicious transaction in both time and distance to Holmes's house, plus the observation of marijuana on his person were sufficient to establish probable cause to issue a warrant to search the house. *Id.* Although the case did not turn on application of the good faith exception, the Court added that, "[a]t the very least, [it] would fall within the realm of a marginal case in which . . . deference must be given to the warrant." *Id.*

Cases in which the Court has refused to apply the good faith exception demonstrate that the safe harbor is foreclosed typically when there is no or little evidence to support a finding of probable cause. *Marshall v. State*, 415 Md. 399, 410 (2010). For example, in *Greenstreet v. State*, the judge issued a search warrant for a residence based exclusively upon evidence obtained during a trash seizure that, according to the officer's affidavit, occurred over a year earlier. 392 Md. at 661. The Court of Appeals held the warrant invalid and refused to apply the good faith exception, noting that "the lack of probable cause [wa]s apparent on the face of the affidavit." *Id.* at 682-83.

### Agurs v. State

The Court of Appeals' opinion in *Agurs v. State*, 415 Md. 62 (2010), has been a point of contention throughout this case. As we next explain, the Court of Appeals produced a plurality opinion with no majority consensus on the grounds for application of the good faith exception. *See* 415 Md. at 99.

In *Agurs*, multiple confidential informants notified detectives that Gary Agurs was selling crack cocaine in Baltimore City with the help of his cousin, who was also identified by confidential informants. *Id.* at 70. The warrant affidavit alleged that Agurs and his cousin were distributing crack cocaine and that evidence of this could be found at a

43

residence located at 3 Six Point Ct. *Id.* at 72-73. On one occasion, the police observed Agurs leave 3 Six Point Ct. and then drive to and enter a clothing store with another unknown male who, after one minute, exited the clothing store with a bulge in his pocket that officers had not observed previously. *Id.* at 71. Agurs next met his cousin at an auto detail shop, got into his cousin's car for two minutes, then got back into his own car and both men left the area. *Id.*

Police surveilled Agurs for roughly nine days before applying for a search warrant, noting in their affidavit that they had seen Agurs enter and exit the 3 Six Point Ct. address on several occasions. *Id.* at 71-72. Police determined through research that Agurs owned the 3 Six Point Ct. residence with his wife. *Id.* at 72. Agurs's criminal record showed that he was convicted of CDS manufacturing and production sixteen years prior and for CDS possession twice, twenty years prior. *Id.*

After police obtained a search warrant, they searched the home at 3 Six Point Ct. and recovered cocaine, marijuana, $30,000 in cash, a digital scale, and a handgun, among other things. *Id.* at 74. The trial court granted Agurs's motion to suppress all of the evidence seized from his home, "concluding that there had been no substantial basis for the issuing judge to find probable cause to search[.]" *Id.* We reversed the suppression court's ruling, agreeing that there was no substantial basis, but holding that the good faith exception applied. *Id.* at 75. The Court of Appeals, in turn, agreed that there was no substantial basis for probable cause but disagreed that the good faith exception applied because "no reasonably well-trained police officer could have relied in good faith on the warrant authorizing the search of Agurs'[s] home." *Id.* at 87-88.

44

In regard to the good faith exception, the plurality opinion reasoned that

> the only factual assertion that could have possibly suggested such a nexus was that Agurs once left his home and met with another individual who subsequently had a previously unnoticed bulge in his pocket. Th[at] single assertion, which could have a number of innocent explanations, [did] not constitute indicia of probable cause that drugs might be found in Agurs'[s] home.

*Id.* at 89-90.

Judge Murphy, with Judge Adkins joining, concurred in part but dissented from the majority's reasoning as to the good faith exception. *Id.* at 99-100 (Murphy, J., concurring). Judge Murphy reasoned that the Court could not decide on its own whether the good faith exception should apply and that an evidentiary hearing was necessary. *Id.* He noted that, while courts typically rely solely on the four corners of the affidavit in making such decisions, there are already two well recognized exceptions to that principle. *Id.* at 100.

> [A]n evidentiary hearing is required to determine whether probable cause for the issuance of a search warrant was "tainted," i.e. acquired by illegal electronic surveillance or by what was observed during an unconstitutional warrantless search[] . . . [or] to determine whether certain information in an affidavit must be redacted on the ground that the information at issue is false.

*Id.* (internal citations omitted). Judge Murphy, therefore, argued that the State should have been afforded the opportunity to prove that the officers relied on the search warrant in good faith. *Id.* at 101.

Judge Barbera, with Judge Adkins joining, dissented. *Id.* at 102 (Barbera, J., dissenting). She reasoned that "[f]aithful application" of Supreme Court precedent regarding the good faith exception "compel[led] the conclusion that the police acted in good faith when they searched [Agurs's] home pursuant to the search warrant." *Id.* at 103.

45

After setting forth the relevant legal principles, Judge Barbera explained that "the Supreme Court has not set a particularly high bar for demonstrating a probable cause belief that evidence of a crime might be found in a particular place." *Id.* at 105. Next, she outlined the fluid, non-technical nature of probable cause determinations. *Id.* at 105-06. She accepted, *arguendo*, the proposition that the warrant-issuing judge did not have a substantial basis for probable cause to issue the search warrant. *Id.* at 107. From there, she explained that the supporting affidavit was not of the "bare bones" sort contemplated by the Supreme Court in setting out instances in which the good faith exception should not apply. *Id.* at 108-09.

While Judge Barbera conceded that the affidavit failed to establish a direct nexus between Agurs's suspected drug distribution and "his home as a repository of evidence of his drug activity[,]" she determined that no such showing was necessary to conclude that the police officers had relied in good faith on the warrant. *Id.* at 110. Citing the Supreme Court's holding in *United States v. Arvizu*, 543 U.S. 266 (2002), she explained that courts are entitled to give deference to the knowledge and expertise of law enforcement officers "in developing knowledge about the practices and proclivities of drug dealers." *Id.* at 109-10. She expounded that the Court of Appeals had, in a number of cases, upheld searches where a nexus was not established by direct observation but rather by "the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property." *Id.* at 110-11.

Ultimately, Judge Barbera reasoned that "[i]f thoughtful and competent judges could disagree" as to "whether the warrant affidavit was so lacking in indicia of probable cause of a nexus between [Agurs]'s drug activity and his home as a repository of evidence of that activity as to render official belief in its existence entirely unreasonable[,]" "it follows that the police relied in good faith upon the warrant." *Id.* at 112-13. In her view, "the facts alleged in the warrant affidavit we[re] sufficient to allow reasonable officers, exercising their professional judgment, to believe that there was a fair probability that [Agurs]'s house contained evidence of his suspected drug activity." *Id.* at 113.

Judge Adkins filed a separate dissent to note that while she agreed with Judge Barbera that the police "*could* have acted in good faith," she thought Judge Murphy's suggestion to remand the case for an evidentiary hearing was the more appropriate disposition, as proof that the officers could have relied on the warrant in good faith is not the same as proof that they did. *Id.* at 113 (Adkins, J., dissenting).

The result in *Agurs* was that the Court of Appeals declined to apply the good faith exception where the police only witnessed one incident consistent with CDS activity and Agurs's criminal history was more than ten years old. 415 Md. at 71-73. Part A of the plurality opinion stated that police must be aware of the nexus requirement, given the Court's earlier proclamation that "[a] well-trained police officer is required to be aware of well-established current law and to have a reasonable knowledge of what the law prohibits." *Id.* at 84 (citation omitted). But, the Court noted that, if an affidavit fails to supply a sufficient nexus, that alone will not always foreclose the possibility that the police acted in good faith. *Id.* at 87 n.12. Ultimately, only three members of the Court agreed to

47

a single rationale in part B regarding the good faith exception. Consequently, one can argue that the Court's decision in part B is not binding precedent.[21]

Although both parties have extensively briefed the *Agurs* opinion, we determine this case to be factually distinguishable. The detectives with the Harford County Task Force first observed Mr. Whittington in the company of Mr. Hall, a suspect in a major drug investigation, in early July 2016. A criminal history check revealed that Mr. Whittington was charged and convicted of CDS: Possession with Intent to Distribute- Narcotic in 2005. He was also arrested and charged in 2015 by sheriff's office deputies with possession of over 3 ounces of cocaine and $1,214 in currency. Police surveilled Mr. Whittington and Mr. Hall in July and throughout most of October 2016. In the warrant affidavit, Det. Underhill provides the details of the officers' observations as well as the information

---

[21] "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of [a majority of the Court], the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Derr v. State*, 434 Md. 88, 114 (2013) (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977)). This Court has previously expressed skepticism about the reasoning provided in *Agurs* regarding the good faith exception.

> The overarching disutility of the citation, however, is that in *Agurs v. State* there was no authoritative opinion of the Court. Seven judges produced five opinions (one of which was a non-opinion). Judge Greene wrote a plurality opinion, joined by Chief Judge Bell and Judge Harrell. Judge Battaglia joined in the decision not to apply the Good Faith Exception, but she expressly declined to join in the opinion. Judge Barbera filed a dissenting opinion. Judge Adkins filed a dissenting opinion. Judge Murphy filed a concurring and dissenting opinion, expressly declining to join in the result. The appellant nonetheless quotes the plurality opinion as if it were the unblemished repository of authoritative law. It is not.

*Joppy v. State*, 232 Md. App. 510, 523 (2017).

48

obtained from the GPS tracking technology showing movements and activity that he attested were consistent with CDS activity. The affidavit details that Mr. Whittington returned to the 4 Cloverwood Ct. address each night. Det. Underhill describes the larger drug task force investigation and the role that Mr. Hall and Mr. Whittington played in the drug activity under investigation. He substantiates his familiarity with this type of CDS activity by setting forth his professional history, as well as the professional history of the other detective who provided sworn testimony. Based on these facts, we cannot say that the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[.]" *Greenstreet*, 392 Md. at 679.

The detectives here could have reasonably believed that Mr. Whittington's criminal history, consistent association with a person of interest in a large-scale drug investigation, and suspicious driving behavior "related to a present and continuing violation of [the] law[.]" *Patterson*, 401 Md. at 107. The affidavit was executed very promptly after the officers spent time monitoring Mr. Whittington's movements, and his return to the house every night after engaging in the suspicious activity could support a reasonable belief that drugs would be found therein. *See id.* Though we do not reach the question of whether the warrant-issuing judge in this case had a substantial basis to find probable cause, we cannot say as a matter of law that the detectives "should have second-guessed the issuing-judge's determination that probable cause existed." *Id.* at 109. As set forth above, the warrant application clearly presented "facts and circumstances" and contained more than "wholly conclusory statements[.]" *Agurs*, 415 Md. at 79.

49

The Court of Appeals said in *Agurs* that police are required to be aware of the nexus requirement, 415 Md. at 84, but we do not interpret that to mean that the police must apply it with judicial precision. If that were the requirement, there would be less need for a neutral and detached magistrate to sign off on a search warrant. Besides, on this record, it is clear that two judges came to two different conclusions about whether the warrant application met the nexus requirement. This is not one of the exceptional cases in which an officer should be "required to disbelieve a judge who has just advised him, by word and by action, that the warrant he possesses authorizes him to conduct the search he has requested." *Joppy*, 232 Md. App. 535 (quoting *Massachusetts v. Sheppard*, 468 U.S. 981, 989-90 (1984)). Thus, the circuit court judge was correct in applying the good faith exception and denying Mr. Whittington's motion to suppress.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**